UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No. 6:15-CV-1800-Orl-ＰＧＢ DAB

JOHN DOE, individually,

      Plaintiff,

vs.

VALENCIA COLLEGE, a Florida public
college, THE VALENCIA COLLEGE
BOARD OF TRUSTEES, JOYCE C.
ROMANO, in her individual capacity,
JOSEPH M. SARRUBBO JR., in his
individual capacity, and THOMAS DECKER,
in his individual capacity,

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL
## INJUNCTIVE RELIEF SOUGHT

Plaintiff, JOHN DOE ("John"), by and through his undersigned counsel,

sues Defendants, VALENCIA COLLEGE, a Florida public college ("Valencia"),

THE VALENCIA COLLEGE BOARD OF TRUSTEES (the "Board"), JOYCE C.

ROMANO, in her individual capacity ("Vice President Romano"), JOSEPH M.

SARRUBBO JR., in his individual capacity ("Dean Sarrubbo"), and THOMAS

DECKER, in his individual capacity ("Decker") (hereinafter collectively referred

to as "Defendants"), and seeks damages, declaratory relief, and permanent

injunctive relief against Defendants, and any other and further relief that this Court deems just and proper, and states as follows:

## INTRODUCTION

During the summer of 2014, John and Jane were classmates in a biology course at Valencia. To prepare for their class, John and Jane studied together on a regular basis. During their studies, John and Jane became friends and, John thought, something more.

One evening, after the semester was over, while John was in his home and Jane was in hers, John sent Jane a text message to tell her that he had a "crush" on her. Unbeknownst to John, Jane's jealous ex-husband was with Jane when she received John's message. Jane and her ex-husband called John and berated him. Jane told John, "We are not friends!" Jane's ex-husband threatened John, "I'm going to find you and kick your ass and get you kicked out of school!"

John was hurt by the affront. In the heat of the moment, John sent Jane several text messages. Two hours later, John regretted his actions and apologized to Jane.

Shortly thereafter, Jane and her ex-husband met with Valencia's Dean of Students, Dean Sarrubbo, and accused John of sexually harassing Jane. When John learned of the incident, John assumed that Valencia, pursuant to its written policies, would adjudicate Jane's claims against John through a fair and impartial

2

procedure. John's assumption was wrong. Instead, Valencia's flawed procedures and the discriminatory views of the members of the committee that adjudicated Jane's claim guaranteed that John's guilt was preordained from the moment that Jane accused him.

Valencia's policies gave a single school official, Dean Sarrubbo, in his sole and absolute discretion, the power to decide not only whether to charge John and whether to submit the matter to a disciplinary hearing, but also whether to find John guilty and what sanctions to impose. Dean Sarrubbo thus played the roles of prosecutor, grand jury, petit jury, and judge, all at the same time, all in the same case.

Dean Sarrubbo railroaded John's case through an arbitrary disciplinary hearing, the sole purpose of which was to convict John. From the moment the hearing convened, it was obvious that the disciplinary committee believed Jane's story because she was female and disbelieved John's because he was male. Instead of attempting to prove John's guilt, the disciplinary committee shifted to John the burden of proving his innocence by requiring him to prove why his actions did not constitute sexual harassment. Within five minutes of commencing the committee meeting and before reviewing any evidence provided by John, one member of the disciplinary committee exclaimed, "I don't see what we need to discuss here. He was obviously stalking."

3

The disciplinary hearing was plagued by a number of additional procedural defects:

- Neither John nor the disciplinary committee understood the standard of proof by which John's guilt was measured;

- The disciplinary committee never heard any testimony from Jane and did not allow John to question her;

- The disciplinary committee refused to allow John an opportunity to refute Jane's written statements; and

- The disciplinary committee refused to even look at evidence produced by John that showed that parts of Jane's story were false.

At the conclusion of this sham proceeding, the disciplinary committee concluded that John committed several violations of Valencia's policies: lewd conduct, stalking, sexual harassment, and even physical assault. John's permanent student record now indicates that he was adjudicated guilty of "[p]hysical abuse, including but not limited to, rape, sexual assault, sex offenses, and other physical assault," even though Jane never accused John of physical abuse and even though no evidence presented during the disciplinary hearing indicated that John committed physical abuse. Valencia suspended John for a year, derailing his academic and professional career and ruining his chances of being accepted to a school of equal caliber or any professional nursing program.

John brings the instant action to redress violations of John's rights.

## PARTIES

1.    John is, and all times relevant hereto, was a resident of Seminole County, Florida.

2.    Valencia is a public college and political subdivision of the State of Florida situated in Orange County, Florida. Through its Board, Valencia is responsible for the policies and conduct of its administrators, board members, and employees.

3.    Valencia receives significant federal funding for its education programs through various means including, without limitation, student loans provided to Valencia's students directly by the federal government and through other funds furnished by the federal government.

4.    The Board is the duly elected governing board of Valencia and operates and conducts business in Orange County, Florida. The Board has ultimate responsibility for adopting policy for Valencia's operations.

5.    Vice President Romano is an individual over the age of 18 years, who, upon information and belief, is a resident of Orange County, Florida, and who conducts business in Orange County, Florida. At all times relevant hereto, Vice President Romano was Valencia's Vice President of Student Affairs. John sues Vice President Romano in her individual capacity pursuant to 42 U.S.C. § 1983.

25115612 v1

6.     Dean Sarrubbo is an individual over the age of 18 years, who, upon information and belief, is a resident of Orange County, Florida, and who conducts business in Orange County, Florida. At all times relevant hereto, Dean Sarrubbo was the Dean of Students for Valencia's East Campus. John sues Dean Sarrubbo his individual capacity pursuant to 42 U.S.C. § 1983.

7.     Decker is an individual over the age of 18 years, who, upon information and belief, is a resident of Orange County, Florida, and who conducts business in Orange County, Florida. At all times relevant hereto, Decker was the Manager of Security Services at Valencia. John sues Decker in his individual capacity pursuant to 42 U.S.C. § 1983.

## JURISDICTION

8.     This is an action for damages, declaratory relief, and injunctive relief.

9.     John brings this action pursuant to 42 U.S.C. § 1983 for violations of civil rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

10.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 2201.

11.    John invokes this Court's jurisdiction over related state law claims under the principles of ancillary jurisdiction pursuant to 28 U.S.C. § 1367.

12.    Pursuant to Section 768.28(6)(a), Florida Statutes, John has notified Defendants of his claims in writing six months or more prior to the filing of this action, and said claims have not been resolved. John has fully complied with Section 768.28(6)(a), including providing notice and service, if applicable, to the Florida Department of Financial Services.

13.    This Court has jurisdiction over Defendants because Defendants are residents of Florida, conduct business in Florida, and committed the acts or omissions giving rise to John's claims in Florida.

14.    All conditions precedent to the filing of this action have occurred, accrued, or been waived as a matter of law.

## VENUE

15.    Pursuant to 28 U.S.C. § 1391, venue for this action properly lies in the U.S. Court for the Middle District of Florida, Orlando Division, because all Defendants reside in the Middle District of Florida and because a substantial part of the events or omissions giving rise to John's claims occurred in this district.

## DIVISION

16.    The Orlando Division is the appropriate situs of this action, because the Orlando Division encompasses the counties having the greatest nexus with John's claims.

25115612 v1

## GENERAL ALLEGATIONS

**I.      John Accepts Valencia's Offer to Attend Valencia in Reliance on the Terms Described in Valencia's Policies and Procedures**

17.     John graduated from the University of Michigan with a degree in Economics in 1995 and then worked as a market maker at the Chicago Stock Exchange and then as a registered broker at E*TRADE Financial Corporation.

18.     After working as a broker for several years, John sought a change of career and decided to pursue a nursing degree.

19.     John considered enrolling in Valencia to obtain a nursing degree.

20.     Valencia provided John with a copy of the policies and procedures (the "Policies and Procedures") that Valencia's Board had adopted and approved.

21.     The Policies and Procedures were readily available on Valencia's website, which also contained other policies, regulations, promises, and representations made by Valencia to its potential and actual students.

22.     The Policies and Procedures contained Valencia's policies regarding the resolution of complaints initiated against students.

23.     In consideration for his tuition, Valencia gave John assurances and promises that Valencia would follow and comply with the Policies and Procedures.

24.     John relied on these assurances and promises when accepting Valencia's offer of admission.

## II.     John and Jane Meet as Students at Valencia College

25.     As part of his studies, John enrolled in classes during the Summer 2014 semester, which lasted from May 5, 2014 through July 28, 2014 (the "Summer Semester").

26.     During the Summer Semester, John was a student in Valencia's General Biology I course (the "Biology Course").

27.     Jane Roe ("Jane") was also a student in the Biology Course.

28.     John and Jane were both considered "non-traditional" students. John was forty-two years old at the time he was enrolled in the Summer Semester, and Jane was a single mother.

29.     The Biology Course instructor assigned John, Jane, and two other students to work in a group to perform lab work for the course. The four students exchanged phone numbers.

30.     After talking in class and exchanging text messages outside of class, Jane and John decided to study together for the Biology Course on a regular basis.

31.     As part of their two-person study group, John and Jane met several times at John's home and in restaurants and coffee shops.

32.     Jane struggled with the material in the Biology Course and relied on John for tutoring and assistance.

### III.  John and Jane Become Friends and Successful Study Partners

33.  Over the course of the Summer Semester, John and Jane became friends.

34.  Jane and John communicated on a near-daily basis throughout the Summer Semester.

35.  Their conversations covered topics outside of their schoolwork, including discussions about Jane's child, each of their prior relationships, and other personal topics.

36.  Over the course of the Summer Semester, John and Jane exchanged hundreds of text messages and e-mails.

37.  In many of the texts, Jane expressed gratitude for John's willingness to help her study. For example, Jane wrote to John: "We'll I'm trying to find a sitter so you can help me with this graph thing or I'm gonna lose a lot of points I'll call u tom."

38.  In one of their text message conversations, Jane told John that she needed new furniture. John volunteered that he had "a lot of random stuff in storage and my mother is a packrat . . . So if you need anything in particular . . . who knows I might have it for you . . . lol." Jane asked John what he might be able to give her, and John replied "Random . . . like bar stools . . . Bed frame etc." Jane responded, "I need a new couch lol." John offered, "I got a nice leather one…dark

green...I would need it back eventually though. It's my favorite!" Jane replied, "I don't know how I feel about dark green I'm looking for black or brown." John then jokingly offered Jane a cuckoo clock, stating "Its got a bird that pops out and everything! Lol." Jane responded "Ha ha noooo."

39.     In another text message conversation, Jane told John that she needed a new computer. John responded, "I have so much computer stuff that I have no need for." John offered to provide Jane with a computer. Jane replied, "Okay sounds good let's plan next week." John later tried to schedule a day to deliver the computer, and Jane responded, "Hey sorry didn't have my phone on my I am happy you are helping me out with a computer just didn't have my phone."

40.     On another occasion, after Jane missed class due to illness, Jane told John, "I am getting myself too sick with stress and a lot going on." To help Jane feel better, John offered to purchase a massage session for Jane at Massage Envy, a local massage parlor. Jane responded enthusiastically, "Sweet! A massage where? Sure if you think it will help me." Later, John told Jane that he hoped she could keep her appointment with Massage Envy, to which Jane replied, "Me too bc I really need one.. And thank you I hope I'm okay too."

41.     John and Jane also encouraged each other in their studies. John messaged Jane, "You've come along nicely over the semester miss scholar!!" to which Jane responded, "You have done way better than me but thank you."

11

42.     Through their extensive interactions over the course of the Summer Semester, John grew fond of Jane, and he believed the feeling was mutual.

43.     On one occasion before the Summer Semester ended, John admitted to Jane that he had a "crush" on her. Jane responded by telling John that she was in a relationship. John did not raise the issue again during the Summer Semester, and John and Jane continued to study together.

44.     A few days before the final exam in the Biology Class, John offered to share his class notes with Jane. Jane happily accepted and asked John to deliver his notes to Jane's work address.

45.     After studying together throughout the Summer Semester, John and Jane's hard work paid off. When the grades were posted on July 28, 2014, John learned that he had achieved the highest grade in the class and that Jane had attained the third highest grade.

46.     John and Jane both enrolled in a physiology course for the fall semester to continue their studies together.

**IV.     John and Jane's Falling Out**

47.     On August 3, 2014, after the Summer Semester had ended and before the fall semester had begun, at approximately 10:20 p.m., John was in his residence, located off-campus.

25115612 v1

48.    At the same time, Jane was in her residence, also located off-campus. Unbeknownst to John, Jane's ex-husband was with Jane in her residence.

49.    At that time, John and Jane had the following conversation by text messages:

**John:** I wanted to ask you something. . .

**John:** I will text and explain or quicker to call

**Jane:** U can text I can't talk on the phone at the moment

**John:** Doesnt change study and whatever. . . I just kinda hoped you would come around. . . be interested in me. . . according to facebook. . . u dating [your ex-husband]? Just have to ask. . . hopefully u understand. . .

**John:** I just saw that. . . U know. . . Was like what?!?!

**Jane:** And saw what exactly on my Facebook? We are not even friends so how did u get on their..

**John:** So we arent friends??

**Jane:** Listen I have a bf, I have been busy with work why are u texting me that when we already discussed this?? I'm sorry but I have told u several times

**Jane:** How do you know my sons fAther?

**John:** Facebook

**Jane:** How do u know his name I never told you

**John:** Facebook

**John:** U dont have to be FB friends to see posts

**John:** Ok. . . Dont wanna make u mad. . . I brought it up last time bc FB made it appear you ended ur relationship

13

**John:** Listen. . . Cant u just understand if i had a little crush i would want to know. . .

**John:** U never sent any signals. . . I guess i just wanna ask what your plans are

50.     Jane's ex-husband read John's messages to Jane and became angered.

51.     Immediately after the last text message from John, at approximately 10:41 p.m., Jane called John and berated him. Jane told John, "We are not friends, you have crossed the line!" After a semester of studying and socializing together, John was shocked to hear Jane say that they were not friends.

52.     During Jane's call to John, Jane's ex-husband took the phone from Jane and threatened John, "I'm going to find you and kick your ass and get you kicked out of school! I'm going to enjoy knocking you to the ground!"

53.     Responding to Jane's ex-husband's threat, John told Jane's ex-husband that if he truly intended to find John and attack him, then John would have to stand his ground. Jane's ex-husband hung up the phone.

54.     This call lasted for about sixteen minutes and ended at 10:57 p.m.

55.     After Jane's ex-husband hung up the phone, Jane called John a second time and berated him for two minutes until 11:00 p.m.

56.     At approximately 11:00 p.m., Jane's ex-husband called the Seminole County Sheriff's Office and reported that John was "calling his wife's cell."

14

57. Contrary to Jane's ex-husband's allegations, Jane initiated both calls to John.

58. Following the heated call from Jane and her ex-husband, John was hurt that Jane had seemingly used him for tutoring while they were in the same class but then discarded him as soon as he was no longer of use to her.

59. After being rejected by Jane and threatened by her ex-husband, John sent Jane several text messages over the course of the following seventeen minutes until 11:17 p.m.

60. At 11:17 p.m., Deputy Brenton Rush of the Seminole County Sheriff's Office ("Deputy Rush") contacted John. Deputy Rush spoke on the phone with John for eleven minutes. Deputy Rush advised John that the Sheriff's Office was taking no action in the matter because it was not a criminal matter. Deputy Rush recommended that John should probably stop talking to Jane. At no time did Deputy Rush or another law enforcement officer instruct John to cease contacting Jane or issue a formal citation to John.

61. Approximately two hours after Deputy Rush contacted John, John apologized to Jane in a text message. John explained to Jane that her rebuff had hurt his feelings. John told Jane that she "showed good character at class" and that he hoped she continued with her studies.

62. None of John's messages to Jane contained threats.

15

63.    At no time that night did John actually make any physical contact with Jane or her ex-husband.

64.    At all times during their argument, John and Jane were approximately fifteen miles apart in their respective off-campus residences.

65.    In sum, the entire argument was a flurry of late-night phone calls and text messages that lasted over the course of several hours. It was the first time that John and Jane had argued since they met.

### V.    The Aftermath of the Argument

66.    On August 4, 2014, the morning after the argument, Jane's father called John and told John that he was displeased about John's argument with Jane. Jane's father explained that Jane had anxiety issues, an eating disorder, and other issues that he did not want to discuss, and that Jane's mother had died when Jane was only two.

67.    John apologized and explained that he and Jane had simply had an argument.

68.    Jane's father assured John that he did not expect anything further to come from the argument.

69.    Jane's father requested John to delete Jane's contact information and have no further contact with her.

70. John followed up their conversation with text messages to Jane's father apologizing for his actions.

71. On August 6, 2014, in an effort to repair their friendship, John sent a message to Jane stating, "[Jane] im just sending this 1 message - i apologize for being so angry, i was hurt. Im over it… Just good luck in school."

72. To put the incident behind him, John deleted Jane's contact information, as well as all the text messages the two had ever exchanged, from his phone.

## VI.   Jane's Complaint to Valencia

73. On August 11, 2014, over a week after Jane and John's argument, Jane and her ex-husband went to the office of Dean Sarrubbo, Valencia's Dean of Students. Jane and her ex-husband told Dean Sarrubbo that John had sexually harassed Jane. Dean Sarrubbo recommended that Jane make a report with Valencia College Security Services ("Security Services"). Jane's meeting with Dean Sarrubbo lasted five minutes.

74. The same day, Jane and her ex-husband went to the office of Security Services and reported that John had stalked and sexually harassed Jane. Jane made a written complainant to Deputy Thorne detailing her allegations (the "Complainant Statement").

75.     In the Complainant Statement, Jane made several false allegations, including. Jane wrote that John called Jane several times on the night of August 3, when in fact it was Jane who called John two times. Jane also wrote that John made an unprovoked threat to kill Jane's ex-husband, when in fact it was Jane's ex-husband who first threatened to attack John. Jane also falsely stated that John called Jane a "slut."

76.     Jane submitted the Complainant Statement to Valencia's Security Services office. She then spoke to Deputy Thorne. Deputy Thorne filled out a report recording Jane's allegations (the "Incident Report"). The Incident Report also contained several inaccuracies, including:

     a.    John began to continually text and call Jane at the end of the Summer Semester;

     b.    John "insisted" on buying a computer for Jane and going to her home to set it up, and Jane "clearly let [John] know that she was not interested";

     c.    John sent Jane pictures of himself having sex with other women;

     d.    John called Jane a "slut";

     e.    John made an unprovoked threat to shoot Jane's ex-husband; and

     f.    John was "tracking" Jane, her ex-husband, and her ex-boyfriend on Facebook.

77.     Deputy Thorne sent the Incident Report to Dean Sarrubbo.

18

## VII.   Title IX Governs Valencia's Response to Jane's Allegations

78.    Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*, and its implementing regulations, 34 C.F.R. Part 106 (collectively, "Title IX"), prohibit discrimination on the basis of sex in the operations of public or private colleges or universities that receive federal funds ("Recipients").

79.    Title IX governs the procedures that Recipients use to investigate and adjudicate allegations of sexual harassment. Recipients must adopt grievance procedures that are prompt, thorough, and equitable. Title IX provides that grievance procedures are not equitable if students do not know how the procedures work.

80.    Title IX imposes very specific procedural requirements on Recipients that investigate allegations of sexual harassment.

81.    Recipients must maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings.

82.    Recipients must use a "preponderance of the evidence" standard to adjudicate complaints.

83.    Both the complainant and the accused must be afforded similar and timely access to any information that will be used at the hearing.

84.    Both the complainant and the accused must have the opportunity to present witnesses and other evidence.

25115612 v1

85. Investigation and hearing processes must be impartial, which requires disclosing any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties.

86. Title IX requires public school Recipients to protect the due process rights of the accused party. In a proceeding investigating allegations of sexual harassment, rights established under Title IX must be interpreted consistent with federally guaranteed due process rights.

87. Each Recipient must designate at least one employee to serve as a Title IX coordinator. The Title IX coordinator is responsible for overseeing all Title IX complaints, coordinating the Recipient's efforts to comply with and carry out the Recipient's Title IX responsibilities, and identifying and addressing any problems that arise during the review of such complaints.

88. Title IX requires Recipients' employees to be sufficiently trained in compliance with Title IX's standards. Additionally, all persons involved in implementing a Recipient's grievance procedures (e.g., Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence as well as training in the recipient's grievance procedures.

25115612 v1

## VIII. Valencia's Policies and Procedures Governing Sexual Harassment

89.    At all relevant times, Valencia's Policies and Procedures contained written policies and procedures relating to sexual harassment.

90.    The Policies and Procedures defined "harassment" as:

A type of Discrimination that occurs when verbal, physical, electronic, or other conduct based on an Individual's Protected Status interferes with that individual's:

- educational environment;

- work environment;

- participation in a College program or activity; or

- receipt of legitimately-requested services (e.g., disability or religious accommodations),

and creates Hostile Environment Harassment or Quid Pro Quo Harassment.

91.    The Policies and Procedures defined "sexual harassment" as:

Any unwelcome sexual advance, request for sexual favors, or other unwelcome verbal or physical conduct of a sexual nature, when:

- Submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of an individual's academic work, employment, or participation in any aspect of a College program or activity; or

- Submission to or rejection of such conduct by an individual is used as the basis for decisions affecting the individual; or

- Such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance, i.e., it is sufficiently serious, pervasive, or

21

persistent as to create an intimidating, hostile, humiliating, demeaning, or sexually offensive working, academic, or social environment under both an objective (a reasonable person's) and subjective (the Reporting Party's) view.

92. The Policies and Procedures defined "stalking" as:

Repeated, unwanted attention; physical, verbal, or electronic contact; or any other course of conduct directed at an individual that is sufficiently serious to cause physical, emotional, or psychological fear or distress or to create a hostile, intimidating, or abusive environment for a reasonable person in similar circumstances and with similar identities. Stalking may involve individuals who are known to one another, who have a current or previous relationship, or who are strangers. Stalking includes the concept of cyber-Stalking, a particular form of Stalking in which electronic media such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact are used to pursue, harass, or to make unwelcome contact with another person in an unsolicited fashion.

93. The Policies and Procedures stated:

Valencia College is an equal opportunity institution, and it is the policy of the District Board of Trustees to provide equal opportunity for employment and educational services to all current and prospective students and employees without regard to race, color, national origin, age, religion, disability, marital status, gender, sexual orientation and any other factor protected under applicable federal state, and local civil rights laws, rules and regulations. It is the policy of the District Board of Trustees that sexual harassment of students, faculty, and staff is prohibited. Complaints of sexual harassment will be treated and investigated with full regard for the College's due process requirements.

94. The Policies and Procedures stated:

It is a violation of this policy to file a discrimination or harassment complaint in bad faith. The College recognizes that injury can be done to both the victim of discrimination or harassment and the person accused of discrimination or harassment. The accused also has rights

22

that this policy must preserve and protect. Any person who abuses this policy by filing a frivolous compliant will be subject to discipline if it is determined that the complaint was filed in bad faith. This provision is not meant in any way to discourage legitimate complaints.

95.    The Policies and Procedures provided that the Dean of Students had authority for student discipline and was responsible for implementing the student disciplinary system.

96.    The Policy established several grounds for discipline, including:

> 10. Physical abuse, including but not limited to, rape, sexual assault, sex offenses, and other physical assault; threats of violence; or conduct that threatens the health or safety of any person.

> 11. Sexual harassment, as defined in College policy (see Policies 6Hx28:02-01, 02-02, and 02-03): Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when: . . .

>> c. Such conduct has the purpose or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive College environment. In determining whether the alleged conduct constitutes sexual harassment, consideration shall be given to the record of the incident as a whole and to the totality of the circumstances, including the context in which the alleged incidents occurred.

> 12. Stalking behavior in which an individual willfully, maliciously, and repeatedly engages in a knowing course of conduct directed at a specific person which reasonably and seriously alarms, torments, or terrorizes the person, and which serves no legitimate purpose. . . .

> 17. Disorderly or lewd conduct.

97. The Policies and Procedures did not define "lewd conduct" or "disorderly conduct."

98. The Policies and Procedures established the procedures by which Valencia investigated and adjudicated complaints of sexual harassment. These procedures empowered the Dean of Students with exclusive control over both the substance and procedure of the investigation and adjudication of a case.

99. The Policies and Procedures required complaints of sexual harassment to be referred to the Dean of Students.

100. The Dean of Students would then hold an initial conference with the students to discuss the allegations. The Dean of Students, in his or her exclusive and absolute discretion, would decide whether to refer the case to mediation, refer the case to a disciplinary committee, or reach a conclusion as to the appropriate sanctions.

101. If the Dean of Students convened a student conduct committee, the Policies and Procedures required the Dean of Students to chair the student conduct committee, and the Dean of Students could participate in the committee's deliberations and discussions. The Dean of Students also had the power to modify the committee's procedures.

102. The Policies and Procedures provided that a student conduct committee's role was purely advisory. A student conduct committee could provide

24

the Dean of Students with non-binding recommendations. The Dean of Students, had the authority in his or her sole and absolute discretion to make all final determinations of the guilt or innocence of the accused.

103.   Moreover, the Dean of Students also had authority in his or her sole and absolute discretion to determine the punishment to impose against a student whom the Dean of Students found guilty.

104.   The Policies and Procedures purported to guarantee the following procedural protections to the accused:

    a.    A written notice of the specific charges at least 24 hours prior to the scheduled conference with additional time at the campus Dean of Students or designee's discretion.

    b.    Reasonable access to the case file prior to and during the conference

    c.    An opportunity to respond to the evidence

    d.    A right to be accompanied by an advisor. At their own discretion, person(s) who filed the report of student conduct violation and students referred for disciplinary action may be advised by a College student, faculty, or staff member or a personal friend. The role of advisors is limited to consultation. While advisors may be present at Disciplinary Conferences or hearings, they may not address hearing bodies, speak in Disciplinary Conferences, or question witnesses. Because the purpose of this disciplinary process is to provide a fair review of alleged violations of this Code rather than a formal legal proceeding, participation of persons acting as legal counsel is not permitted. . . .

    f.    The Dean of Students will exercise control over the proceedings to avoid needless consumption of time and to achieve orderly completion of the hearing.

25115612 v1

g.    The Dean of Students or designee may make audio recordings of hearings. . . .

i.    Persons who participate in providing information at the Disciplinary Conference will be asked to affirm that their testimony is truthful and may be subject to charges of violating the Student Code of Conduct by intentionally providing false information to the Student Conduct Committee. . . .

l.    Affidavits will be considered only if signed by the affiant and witnessed by the campus Dean of Students or designee.

m.    The Student Conduct Committee will make a recommendation of findings and sanctions to the campus Dean of Students or designee who is conducting the hearing.

n.    The campus Dean of Students or designee conducing the hearing will receive the recommendation of the committee, consider procedural integrity and consistency with the outcomes of prior judicial cases, and make a final determination of the outcome and sanctions.

105.    The Policies and Procedures provided for an appeal process handled by the Vice President for Student Affairs. The Policies and Procedures stated:

1.    The appeal must be in writing and delivered to the Vice President for Student Affairs within seven days after the notice of suspension or dismissal is delivered to the address on record for the student in the Office of the Registrar.

2.    Appeals will be reviewed by the Vice President for Student Affairs to determine their viability as soon as possible after the appeal is received.

3.    The Vice President for Student Affairs will determine viability based on whether there is new information that significantly alters the finding of fact, evidence of improper procedure, findings that are against the weight of the evidence, or excessive sanctions. The decision of the Vice President for Student Affairs about the viability of the appeal is final. The

Vice President may deny the request for appeal and affirm the findings of the Dean of Students or grant the request for appeal.

4. Appeals will be decided based on the report filed by the Dean of Students, the student's written statement, and any written response or memoranda prepared by College officials. All written materials considered by the Vice President for Student Affairs will be subject to inspection by the student. The student may request an opportunity to discuss the written materials in person with the Vice President for Student Affairs. New hearings will not be conducted on appeal. Decisions rendered by the Vice President for Student Affairs are final.

## IX.   Valencia's Initial Response to Jane's Allegations

106.   Valencia's Policies and Procedures dictate that, as Valencia's Dean of Students, Dean Sarrubbo simultaneously played several roles in any sexual harassment incident. Dean Sarrubbo was in charge of performing the initial investigation into Jane's accusation and determining whether to charge John with a violation, whether to convene a student conduct committee, whether to find John guilty or innocent, and what sanctions to impose against John.

107.   On August 13, 2014, Dean Sarrubbo sent an e-mail to John that stated, in relevant part:

> The Dean of Students' Office has received information alleging violations of Valencia's Student Code of Conduct as outlined in policy 6Hx28: 8-03. The details are as follows:
>
> Date of Incident:   08/03/2014
>
> Location:                Off-campus
>
> Conduct Violation: 6Hx28: 8-03, IIIA: 10. Physical abuse, including but not limited to, rape, sexual assault, sex

27

offenses, and other physical assault; threats of violence; or conduct that threatens the health and safety of any person. 11. Sexual harassment; as defined in College policy (see Policies 6Hx28:02-01, 02-02, and 02-03): Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature. 12. Stalking behavior in which an individual willfully, maliciously, and repeatedly engages in a knowing course of conduct directed at a specific person which reasonably and seriously alarms, torments, or terrorizes the person, and which serves no legitimate purpose. 17. Disorderly or lewd conduct.

Summary:    The incident report that I received indicated that you have called and text messaged sexually harassing statements and pictures to a former Valencia classmate.

At this time, I am imposing two interim measures..............

1. You have been dropped from BSC 2093C / 15358 in the fall term 2014. You are no longer enrolled in this course.

2. A No Contact Order has been put in place. You are not to have any contact with [Jane Roe] through any mode of communication, including but not limited to written, verbal, electronic, phone, social media, online, text message, in-person, or e-mail.

108. Dean Sarrubbo forwarded this email to Defendant Decker and other third parties.

109. Dean Sarrubbo purported to institute a "No Contact Order" prohibiting John from contacting Jane despite the fact that no part of Valencia's Policies and Procedures gave him the authority to impose such a measure.

28

110.   After receiving this message, John called Dean Sarrubbo and scheduled a meeting for August 15, 2014, at 2:00 p.m.

111.   On the same day that John received Dean Sarrubbo's email, Jane sent three text messages to John in which Jane accused John of creating fake Facebook accounts to obtain information about Jane. John responded to these messages to deny Jane's accusations.

112.   On August 15, 2014, Dean Sarrubbo spoke with Deputy Rush about Jane's allegations.

113.   On August 15, 2014, John met with Dean Sarrubbo to discuss Jane's allegations.

114.   At their August 15 meeting, Dean Sarrubbo showed John the Incident Report that Deputy Thorne had written based on Jane's statements.

115.   John explained that on the night of August 3, John texted Jane, and Jane called John and yelled at him.

116.   John stated that Jane's ex-husband took the phone from Jane and threatened that he was going to "find you and kick your ass and get you kicked out of school! I'm going to enjoy knocking you to the ground!"

117.   John told Dean Sarrubbo that John had sent several text messages to Jane after Jane's phone call because he was hurt that she would say that they were not friends after a semester of studying together.

118.   John told Dean Sarrubbo that he sent picture messages to Jane, but denied that any of those pictures depicted him performing sexual acts with other women, as Jane alleged.

119.   Finally, John also admitted that he looked at Jane's ex-husband's and ex-boyfriend's Facebook profiles, but denied that he was "tracking" them in any way.

120.   John explained that he and Jane had developed a friendship over the course of the Summer Semester and that he had a "crush" on Jane. He believed that his decision to confess his feelings for Jane while her ex-husband was by her side caused the argument.

## X.   The Sham Investigation

121.   After meeting with John, Dean Sarrubbo decided to charge John with violations of the Policies and Procedures and determined that a formal disciplinary hearing was necessary.

122.   On August 19, 2014, Dean Sarrubbo sent an email to John notifying him that a formal disciplinary hearing on Jane's allegations (the "Disciplinary Hearing") would be held on August 25, 2014.

123.   This gave John only five days to prepare for the hearing that would change the course of his life.

25115612 v1

124. Dean Sarrubbo's email notified John that Dean Sarrubbo was charging John with four violations of Valencia's Policies and Procedures: "[p]hysical abuse"; "[s]exual harassment"; "[s]talking"; and "[d]isorderly or lewd conduct."

125. John requested that Dean Sarrubbo provide John with a copy of Jane's allegations. Dean Sarrubbo responded that the documentation in his possession was classified and directed John to contact the Valencia Security Department to obtain a copy of Jane's Complainant Statement or Security Services' Incident Report.

126. When John contacted Security Services to obtain a copy of any complaints or allegations against him, Security Services informed him that he was not allowed to see a copy of Jane's Complainant Statement or Security Services' Incident Report.

127. Unable to obtain a copy of the allegations against him from Security Services, John returned to Dean Sarrubbo's office. Dean Sarrubbo refused to see John, and Dean Sarrubbo's secretary impatiently informed John that Dean Sarrubbo could offer no more assistance that day.

128. John met with Dean Sarrubbo again on August 19, 2014. At this meeting, John asked Dean Sarrubbo about Valencia's sexual harassment policy in its Policies and Procedures, which stated: "In determining whether the alleged conduct constitutes sexual harassment, consideration shall be given to the record of

31

the incident as a whole and to the totality of the circumstances, including the context in which the alleged incidents occurred." John asked if the Disciplinary Hearing would address the totality of the circumstances, including John and Jane's previous amicable interactions. Dean Sarrubbo responded that John should "keep in mind how Jane interpreted and felt about the incident."

129. At this meeting, Dean Sarrubbo allowed John to read the Incident Report, but Dean Sarrubbo did not have Jane's Complainant Statement or any other evidence from Jane.

130. On August 21, 2014, Dean Sarrubbo met with Jane. Besides the five-minute meeting between Dean Sarrubbo, Jane, and Jane's ex-husband on August 11, this was Dean Sarrubbo's and Jane's first opportunity to discuss Jane's allegations. During their meeting, Jane provided Dean Sarrubbo with screenshots of some of the text messages between Jane and John, as well as text messages between John and Jane's father.

131. Jane did not, however, provide any text messages or communications that she and John exchanged prior to the time that she called John, nor did she provide all of the text messages that she and John exchanged on the night of August 3.

132. Dean Sarrubbo did not request additional information from Jane.

133.   Dean Sarrubbo did not require Jane to appear at the Disciplinary Hearing.

134.   On August 22, 2014, the day after Dean Sarrubbo met with Jane, John met with Dean Sarrubbo again. This meeting, only three days before the Disciplinary Hearing, was John's first opportunity to review the evidence provided by Jane.

135.   John had already deleted all of his text conversations with Jane, but he informed Dean Sarrubbo that he would make every effort to retrieve those communications to provide context for their communications.

136.   During this meeting, John asked Dean Sarrubbo how Valencia defined sexual harassment. Dean Sarrubbo angrily replied, "No! I've spent more time with you than any student in my fifteen years of doing this," and brought the meeting to an abrupt end.

137.   That night, John used a program to retrieve the messages that he and Jane exchanged before August 3. These messages included conversations between John and Jane about their studies, about Jane's acceptance of John's offer to schedule a massage for her, and about Jane's acceptance of John's offer to buy a new computer for her. John provided these text messages to Dean Sarrubbo on August 24, 2015.

## XI.   The Sham Disciplinary Hearing

138.   The Disciplinary Hearing was scheduled for August 25, 2014, at 2:00 p.m.

139.   The student conduct committee that was to review John's case was composed of Dean Sarrubbo, Decker, Rafael Davila ("Davila"), Natalie Hofreiter, and a student member (the "Disciplinary Committee"). Dean Sarrubbo was the chair of the Disciplinary Committee.

140.   On the morning of August 25, 2014, Dean Sarrubbo e-mailed the other members of the Disciplinary Committee and stated that he wanted to meet with them thirty minutes prior to the Disciplinary Hearing because "We have A LOT to go over before we meet with [John] at 2:00 PM." Dean Sarrubbo copied third parties in this message.

141.   At the Disciplinary Hearing, only the members of the Disciplinary Committee and John were present. Jane was not present. Jane's ex-husband was not present. No other witnesses were present.

142.   The room where the Disciplinary Hearing occurred was equipped with audio recording equipment, but Dean Sarrubbo stated that recording was not allowed and that the Disciplinary Committee did not consent to being recorded. No recording or transcript of the Disciplinary Hearing was made.

143.  Dean Sarrubbo began the meeting by reading a "Title IX Opening Statement."

144.  After Dean Sarrubbo read this opening statement, he did not provide John an opportunity to make an opening statement of his own. Instead, the Disciplinary Committee proceeded directly to question John about the accusations levied against him by Jane and her ex-husband.

145.  From the start, the Disciplinary Committee was hostile towards John.

146.  Only five minutes into the Disciplinary Committee's questioning, Decker stated aloud to the Disciplinary Committee, "I don't see what we need to discuss here. He was obviously stalking." Decker then stated directly to John, "I'll be shocked, *shocked*, if you don't face criminal charges on this." Decker then cited Florida criminal statutes relating to stalking and aggravated stalking, even though John was charged with violating Valencia's Policies and Procedures, not Florida criminal statutes.

147.  During the Disciplinary Hearing, the Disciplinary Committee referred to John's gender and sex as if these alone were evidence of John's guilt. For example, when John stated that he was upset and hurt at Jane's sudden change in attitude toward him after they had studied and socialized together for an entire semester, Decker retorted impatiently: "You're a forty-two-year-old man, you

35

should just get over it!" Decker's statement reveals that Decker was basing his decision of John's guilt on John's gender.

148. The Disciplinary Committee criticized John's offer to schedule a massage for Jane. Davila asked, "How could you have possibly thought it was appropriate to purchase [Jane] a massage? When was the last time you bought a massage for a male friend?" John responded that he had not purchased a massage for a male friend. Davila exclaimed, "See?!" Dean Sarrubbo agreed that John's offer was inappropriate. Davila's statements reveal that he was basing his decision of John's guilt on John's gender. John requested that the Disciplinary Committee consider Jane's response to John's offer to purchase Jane a massage, in which Jane replied, "Sweet! A massage where? Sure if you think it will help me." The Disciplinary Committee refused to even look at this evidence.

149. Instead of attempting to prove John's guilt, the Disciplinary Committee required John to prove his innocence. In discussing the text messages that John sent Jane after their argument, Dean Sarrubbo asked John, "How could this *not* be sexual harassment?" John, who is not a lawyer, attempted to provide a definition of sexual harassment and explain why his behavior did not constitute sexual harassment. Dean Sarrubbo then asked John, "What more would you have needed to do for these messages to rise to the level of sexual harassment?" John

again attempted to define sexual harassment and explain what actions would have risen to the level of sexual harassment.

150.   During the Disciplinary Hearing, the Disciplinary Committee referred to copies of text messages provided by Jane. At several times, John asked the Disciplinary Committee to also consider copies of text messages that John brought to the Disciplinary Hearing. These messages showed the context of the conversations between John and Jane. The Disciplinary Committee refused to consider any of John's evidence.

151.   After the Disciplinary Committee had interrogated John for thirty-five minutes, Dean Sarrubbo stated to John, "Now is your opportunity to address the [Disciplinary Committee] and wrap things up."

152.   This was John's first and only opportunity to give his version of the story. It was short-lived.

153.   John was instantly met with hostility and outright dismissal. John began by stating that there were many issues that the Disciplinary Committee had not yet considered. Dean Sarrubbo declared, "I believe we have covered everything."

154.   John then stated, "I would like to go over the complaint against me line by line." Dean Sarrubbo responded, "No, I believe we have covered everything."

37

155.  John argued that Jane's statement contained falsities, such as Jane's claim that John sent her pictures of him having sex with other women. John attempted to disprove this allegation, but the Disciplinary Committee was dismissive of his argument.

156.  John also stated that he wanted to discuss Jane's allegation that John had created face Facebook accounts to gain information about Jane. Again, the Disciplinary Committee refused to hear John's argument on this issue.

157.  John attempted to introduce into evidence the full set of text messages that John and Jane had exchanged. The Disciplinary Committee refused to look at these messages.

158.  John's opportunity to present his case lasted only five minutes. In Dean Sarrubbo's words, the Disciplinary Committee wished only for John to "wrap things up." The Disciplinary Committee then adjourned.

159.  The Disciplinary Committee refused to allow John an opportunity to confront witnesses. At no time during the Disciplinary Hearing did John have an opportunity to confront Jane. At no time during the Disciplinary Hearing did John have an opportunity to confront Jane's ex-husband. At no time during the Disciplinary Hearing did John have an opportunity to confront Deputy Rush, who had received Jane's call on the night of the argument, or Deputy Thorne, who spoke with Jane when she filed a complaint with Valencia's Security Services

38

160. The Disciplinary Committee also failed to question any other witnesses besides John. The Disciplinary Committee did not hear testimony from Jane. The Disciplinary Committee did not hear testimony from Jane's ex-husband. The Disciplinary Committee did not hear testimony from Deputy Rush or Deputy Thorne.

161. Instead, the Disciplinary Committee relied exclusively and entirely on Jane's written allegations, which were made outside the Disciplinary Hearing.

162. The Disciplinary Committee even refused to allow John to confront Jane's written allegations against him. When John asked if he could rebut Jane's written statement, the Disciplinary Committee refused.

163. In sum, the Disciplinary Committee limited John's ability to participate in the Disciplinary Hearing, defend himself, and confront his accuser.

164. Around the time of the Disciplinary Hearing, Dean Sarrubbo contacted the Dean of Student Services of South Florida State College and discussed the details of John's case.

## XII.  Absence of Written Findings

165. On August 26, 2014, Dean Sarrubbo sent John the following e-mail (the "Decision") informing John of the Disciplinary Committee's conclusions:

Dear [John]:

This official email communication is a follow-up to the disciplinary committee meeting held on Monday, August 25, 2014 at 2:00pm

EDT. During the meeting, you had the opportunity to discuss the incident and the allegations made against you. Based on the information received and the facts you presented, it has been determined that you did in fact violate the Student Code of Conduct (6Hx28: 8-03, IIIA: 10, 11, 12, 17) at Valencia College:

10. Physical abuse, including but not limited to, rape, sexual assault, sex offenses, and other physical assault; threats of violence; or conduct that threatens the health and safety of any person. 11. Sexual harassment; as defined in College policy (see Policies 6Hx28:02-01, 02-02, and 02-03): Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when: C. Such conduct has the purpose or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive College environment. In determining whether the alleged conduct constitutes sexual harassment, consideration shall be given to the record of the incident as a whole and to the totality of the circumstances, including the context in which the alleged incidents occurred. 12. Stalking behavior in which an individual willfully, maliciously, and repeatedly engages in a knowing course of conduct directed at a specific person which reasonably and seriously harms, torments, or terrorizes the person, and which serves no legitimate purpose. 17. Disorderly or lewd conduct.

Also, please be advised of the following:

1. Deputy Brenton Rush from Seminole County Sheriff's Office spoke with you on the phone at around 11:30pm EDT on Sunday, August 3, 2014. He advised you not to have any more contact with [Roe]. However, you chose not to take the advice of a sworn law enforcement professional. Instead, you sent Jane approximately 100 inappropriate text messages into the early morning hours of Monday, August 4, 2014.

2. On Wednesday, August 13, 2014 at 11:38am EDT, I sent you an official email communication in which I explained the allegations against you. In that official email communication, I also issued a No Contact Order. On Wednesday August 13, 2014 at 1:47pm EDT, you emailed me acknowledging receipt of the above referenced email. However, in the evening of Wednesday, August 13, 2014 at approximately 8:45pm EDT, you responded to a text

40

message that Jane sent you. Your text message responses (up until 9:11pm EDT) were in clear violation of the No Contact Order.

After careful deliberation, the following action has been taken:

1. You have been dropped from your fall term 2014 courses at Valencia College.

2. A No Contact Order is still in effect. You are not to have any contact with [Jane] or her father through any mode of communication, including but not limited to written, verbal, electronic, phone, social media, online, text message, in-person, or email.

3. Effective immediately, you are being placed on "Disciplinary Suspension" from Valencia College through summer term 2015. Disciplinary Suspension is the exclusion from College premises and other privileges or activities. Therefore, you are not eligible to register for or attend credit or non-credit classes at any campus location/instructional site of Valencia College. You are not permitted to return to college property (including any campus or other locations where Valencia instruction may be taking place). This action will be permanently recorded on your student record. You may appeal for re-admission beginning in fall term 2015.

4. Seek professional assistance from a licensed mental health professional.

5. A registration hold has been placed on your student record to prevent future registration.

If you decide to request re-enrollment for fall term 2015, please adhere to the following guidelines:

1. You will need to contact my office at . . . after July 13, 2015 to schedule a meeting.

2. Provide me with a letter requesting re-enrollment as a student and explaining your ability and plan for participating in a positive manner in our learning community. . . .

3. Supporting documentation from a licensed mental health professional that demonstrates your commitment to changing your behavior for the better.

4. Sign a release form that authorizes me to communicate with the licensed mental health professional that you have been seeing.

. . . .

While you admitted to the inappropriate text messages and pictures you sent, you felt that your actions did not rise to the level of sexual harassment and stalking. The evidence presented proves otherwise. We were also deeply concerned of your inability to empathize how your actions came across to [Jane].

166. Although Valencia's Policies and Procedures require that the Disciplinary Committee issue written findings of fact, the Decision contains only the following bare-bones findings:

  a. John sent Jane 100 inappropriate text messages;

  b. John did so despite the advice of Deputy Rush;

  c. John responded to Jane's text messages despite Dean Sarrubbo's issuance of a "No Contact Order"; and

  d. The Disciplinary Committee was concerned about John's inability to empathize with Jane.

167. This email constituted the entirety of the written factual findings made by Dean Sarrubbo and the Disciplinary Committee.

168. The evidence presented to the Disciplinary Committee does not support the Decision's findings of facts. For example, the Decision states that John sent 100 inappropriate text messages to Jane after Deputy Rush advised John to no longer contact Jane. No evidence considered by Disciplinary Committee supported

25115612 v1

this finding. Jane provided the Disciplinary Committee with only several text messages from John, and the Disciplinary Committee refused to even look at the text messages that John produced.

169.   The Decision also lacks many important facts. For example, notably absent from the Decision is the fact that Jane initiated the calls to John and that Jane's ex-husband threatened to attack John.

170.   No interpretation of the Disciplinary Committee's factual findings supports the Disciplinary Committee's conclusion that John committed "[p]hysical abuse, including but not limited to, rape, sexual assault, sex offenses, and other physical assault . . . ." Furthermore, no evidence considered by the Disciplinary Committee supports the conclusion that John committed these acts.

171.   Similarly, no evidence considered by the Disciplinary Committee and no factual finding made by the Disciplinary Committee supports the conclusion that John engaged in "[u]nwelcome sexual advances" or "requests for sexual favors."

172.   Nor does any evidence considered by the Disciplinary Committee or any factual finding made by the Disciplinary Committee support the conclusion that John engaged in "[s]talking behavior in which an individual willfully, maliciously, and repeatedly engages in a knowing course of conduct directed at a

43

specific person which reasonably and seriously harms, torments, or terrorizes the person, and which serves no legitimate purpose."

173.   On August 27, 2014, Dean Sarrubbo communicated the details of Jane's allegations and John's punishment to third parties.

174.   On or about September 10, 2014, Decker, the Disciplinary Committee member who declared that he would be "shocked" if John did not face criminal charges, contacted the Seminole County Sheriff's Office. Decker inquired as to whether any criminal charges would be brought against John. The Seminole County Sheriff's Office informed Decker that no criminal charges were forthcoming against John.

175.   John drove to the Seminole County Sheriff's Office twice to inquire whether the Sheriff's Office had a record of any formal complaint against John. On both occasions, the Sheriff's Office confirmed that there were no charges against John.

### XIII. The Rubber-Stamp Appeal

176.   The Decision provided:

According to the Student Code of Conduct procedures, you may appeal this decision to the Vice President for Student Affairs in keeping with the following provisions:

1.   The appeal must be in writing and delivered to the Vice President for Student Affairs within seven (7) days of this notice. Her contact information is as follows:

44

Dr. Joyce C. Romano, Vice President for Student Affairs
Valencia College - District Office
Mail Code: DO-334
P.O. Box 3028
Orlando, FL 32802-3028

2.   Appeals will be reviewed by the Vice President for Student Affairs to determine their viability as soon as possible after the appeal is received.

3.   The Vice President for Student Affairs will determine viability based on whether there is new information that significantly alters the findings of fact, evidence of improper procedure, findings that are against the weight of the evidence, or excessive sanctions. The decision of the Vice President for Student Affairs about the viability of the appeal is final. The Vice President may deny the request for appeal and affirm the findings of the Dean of Students or grant the request for appeal.

4.   Appeals will be decided based on the report filed by the Dean of Students, the student's written statement, and any written response or memoranda prepared by College officials. All written materials considered by the Vice President for Student Affairs will be subject to inspection by the student. The student may request an opportunity to discuss the written materials in person with the Vice President for Student Affairs. New hearings will not be conducted on appeal. Decisions rendered by the Vice President for Student Affairs are final.

177.   The Decision notified John that he had seven days from the date of his receipt of the email containing the Decision to appeal the Decision.

178.   This statement in the Decision contrasts with the Valencia policy that states: "The appeal must be in writing and delivered to the Vice President for

45

Student Affairs within seven days after the notice of suspension or dismissal is delivered to the address on record for the student in the Office of the Registrar." A notice of suspension or dismissal was never delivered to John's address of record in the Office of the Registrar.

179.   August 26, 2014, the day that John received the email containing the Decision, was a Tuesday. Seven days after August 26 was September 2. September 1, 2014 was Labor Day, and Valencia College was closed for Labor Day. The Decision prohibited John from appearing on campus, which prevented him from hand-delivering his appeal. This short time frame and the prohibition against John appearing on campus left him with no choice but to mail his appeal. John mailed his Appeal Letter on August 28 via Priority Mail to ensure that it arrived on time. As a result of the time constraints created by the Decision, John had about only two days to prepare his appeal.

180.   John drafted a letter to Vice President Romano appealing the Decision (the "Appeal Letter"). In his Appeal Letter, John argued that the Disciplinary Committee used a flawed process and reached an incorrect decision.

181.   John noted that "[t]his was an isolated incident that occurred off campus in between semesters over a six hour timeframe and should have not been subject to review based upon Sec. 1D(2) of the Student Code of Conduct."

182. John further stated that "[i]t was clear to me that Dean Sarrubbo and some of the members of the disciplinary committee had reached conclusions based solely on the words contained in the text messages at issue. They stated so."

183. John quoted the following language from Valencia's policy: "In determining whether the alleged conduct constitutes sexual harassment, consideration shall be given to the record on the incident as a whole and to the totality of the circumstances, including the context in which the alleged incidents occurred." John stated that the history of the two parties, "the context, and the incident, when considered in whole, preclude the complaint from being considered harassment, sexual harassment, or stalking."

184. In the Appeal Letter, John took issue with the factual findings in the Decision. He noted that while the Decision stated that John sent 100 text messages after being called by Deputy Rush, in fact John sent only approximately ten text messages after being contacted by Deputy Rush.

185. John further noted that although he did contact Jane after Dean Sarrubbo instructed him not to, John explained, "[Jane] sent me three text messages and I, unfortunately, reflexively responded to them. In light of the serious nature of the allegations, how can her texting me be considered consistent or understandable?"

186. Vice President Romano received John's Appeal Letter on or about August 29, 2014.

187. On the afternoon of September 5, 2014, Vice President Romano e-mailed John a letter denying his Appeal. In her letter, Vice President Romano stated:

> In reviewing your case, I found that the charges were within the scope of the Valencia College Student Code of Conduct which was enacted based on a written complaint we received from the other student involved. When you met with Dean Sarrubbo, you admitted to the behavior and described to him the volume of texts as 100. I will note that the number of texts is not the main focus in this case as much as the continued behavior you exhibited in not controlling your impulses and continuing to engage with the other student when it was clearly communicated to you that such interactions were unwelcome and that you should have no further contact with her.

188. Vice President Romano also stated that John's "inability to self-monitor and control your interactions after you were told to do so by two different professionals and your inability to understand the impact of your behavior on the other student were cause for concern."

189. Vice President Romano chastised John for maintaining his innocence and for exercising his right to appeal, stating, "[i]t appears that you still do not appreciate the impact your behavior had on the other student and the inappropriateness of your excessive communication with her, and then her father in this situation."

190. Vice President Romano thus concluded that John's sanctions were appropriate in part because of his "lack of empathy." Vice President Romano did not attend the Disciplinary Hearing and made this conclusion about John's attitude without meeting or speaking with John or any other witness.

191. On October 11, 2014, John wrote Vice President Romano and requested a written ruling setting forth the specific rationale for her decision and the factual findings supporting the four charges of which John was found guilty. John also informed Vice President Romano that John was unable to locate a provision in the Valencia policy establishing the standard of proof used to determine violations of the four policies that John was found guilty of violating. Vice President Romano did not respond.

192. On the same day, John wrote Leslie Golden, Valencia's Associate General Counsel ("Golden"), and requested information on the standard of proof used to decide the policy violations with which John was charged. Golden did not reply to John's inquiry.

### XIV. John's Complaint of False Accusations

193. Valencia's Policies and Procedures prohibited filing a harassment complaint in bad faith.

194. After the conclusion of the Disciplinary Hearing and the Appeal, John filed a complaint against Jane for making false accusations.

49

195.  On September 11, 2014, Dean Sarrubbo called John and stated: "I'm calling about the online complaint you made against [Jane]. We conducted a thorough and fair investigation and we consider the matter closed."

196.  Whereas Jane's complaint against John turned into a full-blown disciplinary hearing on the basis of accusations alone, John's complaint against Jane was dismissed out of hand.

## XV.  Valencia's Illegal Conduct Has Irreparably Damaged John's Academic Career, Professional Future, and Reputation

197.  After concluding that John committed "physical abuse," "sexual harassment," "stalking," and "lewd behavior," Dean Sarrubbo sanctioned John with a three-term suspension and a ban from campus.

198.  John's permanent student record now reflects that John was found responsible for "physical abuse," "sexual harassment," "stalking," and "lewd behavior."

199.  This sanction prevented John from completing his educational career at Valencia and impedes his ability to complete his educational career elsewhere.

200.  John has been forced to continue his pre-nursing courses at a less-prestigious institution.

201.  The vast majority of nursing schools explicitly forbid the acceptance of students who have been suspended or expelled from a college or university for sexual misconduct.

202. The vast majority of nursing schools also have student transfer policies that require each applicant to provide full and complete copies of the applicant's permanent student record.

203. Similarly, any employer to which John applies will require a background check that would reveal John's permanent student record and Defendants' conclusion that John committed "physical abuse," "sexual harassment," "stalking," and "lewd behavior."

204. Defendants' illegal actions have wrongfully deprived John of the value of the substantial financial resources that he invested in his Valencia education.

205. Defendants' illegal actions have also severely compromised John's ability to pursue his nursing education and obtain his nursing license.

206. Without appropriate redress, the unfair and illegal outcome of the Disciplinary Hearing and the Appeal will continue to cause irreparable damage to John.

207. As a result, John's emotional stability has been extremely compromised, and he has had to undergo regular counseling and psychological therapy. John is taking anti-anxiety drugs for the first time in his life.

25115612 v1

## Causes of Action

## Count I. Violation of Procedural Due Process Rights Pursuant to 42 U.S.C. § 1983 (Valencia & Board)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and THE VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

208. This is a cause of action for violations of civil rights under 42 U.S.C. § 1983 against Valencia and the Board.

209. John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

210. Continued enrollment in a public school is an important entitlement protected by the Due Process Clause of the Fourteenth Amendment.

211. As a student at Valencia, a public university, John had a protected property and liberty interest in continued enrollment in Valencia.

212. The Defendants' actions deprived John of his property and liberty interest in continued enrollment in Valencia without constitutionally-adequate pre-deprivation or post-deprivation process.

213. Specifically, Defendants enacted and enforced the Policies and Procedures so as to deprive John of his due process rights.

25115612 v1

214. Because of Defendants' actions, John has suffered, and continues to suffer, irreparable injury that cannot be fully compensated by an award of monetary damages.

215. Defendants have damaged John by depriving him of his constitutional rights.

216. At all relevant times, Defendants acted under color of state law.

217. Pursuant to 42 U.S.C. §§ 1983 and 1988, John is entitled to an injunction invalidating and restraining enforcement of the Defendants' unconstitutional Policies and Procedures.

218. Pursuant to 42 U.S.C. §§ 1983 and 1988, John is entitled to recover the costs of this lawsuit, including his reasonable attorneys' fees.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order declaring Defendants' Policies and Procedures and actions unconstitutional in violation of John's due process rights, enjoining and restraining enforcement of Defendants' unconstitutional Policies and Procedures, awarding attorneys' fees and costs, and awarding such other and further relief that this honorable Court deems just and proper.

25115612 v1

**Count II. Violation of Procedural Due Process Rights Pursuant to 42 U.S.C. §
1983 (Sarrubbo, Decker, & Romano)**

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned
counsel, and sues Defendants, JOSEPH M. SARRUBBO JR., THOMAS
DECKER, and JOYCE C. ROMANO, and in support thereof states as follows:

219.  This is a cause of action for violations of civil rights under 42 U.S.C.
§ 1983 against Dean Sarrubbo, Decker, and Romano.

220.  John re-alleges and reincorporates the allegations in paragraphs 1
through 207 above as if fully set forth herein.

221.  Continued enrollment in a public school is an important entitlement
protected by the Due Process Clause of the Fourteenth Amendment.

222.  As a student at Valencia, a public university, John had a protected
property and liberty interest in continued enrolled in Valencia.

223.  The Defendants' actions deprived John of his property and liberty
interest in continued enrollment in Valencia without constitutionally-adequate pre-
deprivation or post-deprivation process.

224.  Specifically, Defendants enacted and enforced the Policies and
Procedures so as to deprive John of his due process rights.

225.  At all relevant times, Defendants acted under color of state law.

226.  As a direct and proximate result of the Defendants' actions, John has
suffered damages, including, without limitation, damages to physical well-being,

54

emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

227.   Defendants have damaged John by depriving him of his constitutional rights.

228.   Pursuant to 42 U.S.C. §§ 1983 and 1988, John is entitled to damages in an amount to be determined at trial and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages, awarding attorneys' fees and costs, and awarding such other and further relief that this honorable Court deems just and proper.

## Count III. Violation of Substantive Due Process Rights Pursuant to 42 U.S.C. § 1983 (Valencia & Board)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

25115612 v1

229. This is a cause of action for violations of civil rights under 42 U.S.C. § 1983 against Valencia and the Board.

230. John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

231. Defendants' enactment and enforcement of the Policies and Procedures deprived John of his constitutionally-protected property and liberty interest in continued enrollment in a public university.

232. Defendants' actions in enacting and enforcing the Policies and Procedures were the product of arbitrary state action rather than a conscientious, careful, and deliberate exercise of professional judgment.

233. The Defendants' actions were so lacking in any legal justification or factual basis, so falsely created and so deliberately injurious to John that they shock the conscience and violated John's substantive due process.

234. At all relevant times, Defendants acted under color of state law.

235. Defendants have damaged John by depriving him of his constitutional rights.

236. Pursuant to 42 U.S.C. §§ 1983 and 1988, John is entitled to an injunction invalidating and restraining enforcement of the Defendants' unconstitutional Policies and Procedures.

25115612 v1

237.   Pursuant to 42 U.S.C. §§ 1983 and 1988, John is entitled to recover the costs of this lawsuit, including his reasonable attorneys' fees.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order declaring Defendants' Policies and Procedures and actions unconstitutional in violation of John's due process rights, enjoining and restraining enforcement of Defendants' unconstitutional Policies and Procedures, awarding attorneys' fees and costs, and awarding such other and further relief that this honorable Court deems just and proper.

### Count IV. Violation of Substantive Due Process Rights Pursuant to 42 U.S.C. § 1983 (Sarrubbo, Decker, & Romano)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, JOSEPH M. SARRUBBO JR., THOMAS DECKER, and JOYCE C. ROMANO, and in support thereof states as follows:

238.   This is a cause of action for violations of civil rights under 42 U.S.C. § 1983 against Dean Sarrubbo, Decker, and Romano.

239.   John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

240.   Defendants' enactment and enforcement of the Policies and Procedures deprived John of his constitutionally-protected property and liberty interests in continued enrollment in a public university.

25115612 v1

241.  Defendants' actions in enacting and enforcing the Policies and Procedures were the product of arbitrary state action rather than a conscientious, careful, and deliberate exercise of professional judgment.

242.  Defendants' actions were fraudulent and malicious and showed willful and wanton disregard for John's rights.

243.  The Defendants' actions were so lacking in any legal justification or factual basis, so falsely created and so deliberately injurious to John that they shock the conscience and violated John's substantive due process.

244.  At all relevant times, Defendants acted under color of state law.

245.  As a direct and proximate result of the Defendants' actions, John has suffered damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

246.  Defendants have damaged John by depriving him of his constitutional rights.

247.  Pursuant to 42 U.S.C. §§ 1983 and 1988, John is entitled to damages in an amount to be determined at trial and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

25115612 v1

248. John seeks and is entitled to punitive damages under 42 U.S.C. § 1983.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory and punitive damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages, awarding attorneys' fees and costs, and awarding such other and further relief that this honorable Court deems just and proper.

### Count V. Flawed Procedure and Erroneous Outcome in Violation of Title IX
### (Valencia & Board)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and THE VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

249. This is a cause of action for violations of Title IX against Valencia, and the Board.

250. John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

251. John did not commit "[p]hysical abuse, including but not limited to, rape, sexual assault, sex offenses, and other physical assault." Jane did not make

59

any such allegations against John, and no evidence considered by the Disciplinary Committee supports such charges. Nevertheless, the Disciplinary Committee's Decision concludes that John committed "[p]hysical abuse, including but not limited to, rape, sexual assault, sex offenses, and other physical assault." This is reflected on John's permanent student record.

252.   John also did not commit any of the other violations with which he was charged: "sexual assault," "stalking," and "disorderly or lewd conduct."

253.   Despite the fact that John committed none of these violations, the Disciplinary Hearing wrongly found John guilty of all of these charges.

254.   The Defendants wrongly found John responsible for these violations because they discriminated against John on the basis of his sex.

255.   The statements of the members of the Disciplinary Committee reveal that they discriminated against John on the basis of his sex. When John explained that Jane's angry phone call and the threats made by Jane's ex-husband wounded him, Decker exclaimed, "You're a forty-two-year-old man, you should just get over it!" Decker's statement indicates that Decker believed that John, by allowing his feelings to be hurt by the words of Jane and her ex-husband, did not fit Decker's understanding of what it means to be a "man." Decker's statement also indicates that Decker would have found it perfectly normal for a woman to become emotional in the same circumstances, but not John. Because Decker believed that

60

John reacted in a way that Decker considered inappropriate for someone of John's sex, Decker held an unfavorable opinion of John. Decker's unfavorable opinion of John on the basis of John's sex caused Decker to recommend finding John guilty.

256.   Similarly, Davila stated, "How could you have possibly thought it was appropriate to purchase [Jane] a massage? When was the last time you bought a massage for a male friend?" Davila's statement reveals that Davila believed that a man who purchases a gift for a woman necessarily has an evil intent. Davila's statement also indicates that Davila would have found it perfectly acceptable for a woman to purchase the same present for Jane. Because Davila believed that John acted in a way that Davila considered inappropriate for someone of John's sex, Davila held an unfavorable opinion of John. Davila's unfavorable opinion of John on the basis of John's sex caused Davila to recommend finding John guilty.

257. Decker's and Davila's statements reveal that the Disciplinary Committee prejudged John and discriminated against him on the basis of John's sex.

258.   As a result of Defendants' discrimination on the basis of John's sex, the Defendants wrongly adjudicated John responsible for "physical abuse," "sexual harassment," "stalking," and "disorderly or lewd conduct."

259.   Defendants' discrimination against John on the basis of John's sex violates Title IX.

25115612 v1

260. As a direct and proximate consequence of Defendants' Title IX violation, John has suffered significant damages including, but not limited to, having an academic and/or disciplinary record that improperly reflects that he was found to have committed physical abuse, sexual harassment, harassment, stalking, and lewd behavior.

261. This black mark on John's student record destroys John's ability to enroll in a similarly-ranked educational institution.

262. As a direct and proximate consequence of Defendants' Title IX violation, John has lost any and all monies that he paid to obtain a Valencia degree, including, but not limited to, tuition, living expenses, books, and transportation costs.

263. As a result of the foregoing, John seeks and is entitled to compensatory damages in an amount to be determined at trial, plus attorneys' fees and costs.

264. John is also entitled to an injunction invalidating and restraining enforcement of the Defendants' unconstitutional Policies and Procedures.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and

25115612 v1

professional opportunities, loss of future career prospects, and other direct and consequential damages, awarding attorneys' fees and costs, enjoining and restraining enforcement of Defendants' unconstitutional Policies and Procedures, and such other and further relief that this honorable Court deems just and proper.

### Count VI. Violation of First Amendment as Facially Unconstitutional Pursuant to 42 U.S.C. § 1983 (Valencia & Board)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

265. This is a cause of action for violations of civil rights under 42 U.S.C. § 1983 against Valencia and the Board.

266. John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

267. John and all similarly-situated individuals have the right under the First Amendment of the U.S. Constitution to engage in constitutionally-protected speech.

268. Defendants are depriving John and all similarly situated individuals of their First Amendment rights by promulgating overbroad, vague, and facially unconstitutional policies and procedures.

269. Defendants' Policies and Procedures, and in particular their definitions and descriptions of "sexual harassment," have a chilling effect on

63

John's rights to freely and openly express his theories, ideas, and beliefs in a manner protected by Valencia policy, state law, and by the Constitution of the United States. By promulgating and enforcing the Policies and Procedures, Defendants have violated rights guaranteed to John by the First and Fourteenth Amendments to the Constitution of the United States. These rights and laws are clearly established by governing legal authority.

270. The Policies and Procedures are illegal under the Free Speech clause of the First Amendment. So long as the Policies and Procedures and the enforcement thereof continue to go unpunished, Defendants are causing ongoing and irreparable harm to John and others similarly situated.

271. The Policies and Procedures are vague and overbroad and discriminate on the basis of viewpoint. The Policies and Procedures also interfere with the right of free association, impose unconstitutional conditions on the receipt of state benefits, and constitute an illegal prior restraint on John's rights of free speech and assembly. These policies are therefore facially invalid under the Free Speech clause of the First Amendment. So long as these policies survive, Defendants are causing ongoing and irreparable harm to the John and to every student and student organization at Valencia.

272. By prohibiting, among other things, "verbal or physical conduct of a sexual nature" that "has the purpose or effect of unreasonably interfering with an

individual's performance or creating an intimidating, hostile, or offensive College environment," and by otherwise defining "sexual harassment" in a manner that is both vague and overbroad, Defendants have conditioned compliance with Valencia policies on the subjective emotional experience of the listener and have enacted regulations that limit and prohibit speech without providing any objective guidelines by which John can guide his behavior. Further, Defendants have explicitly and implicitly discriminated on the basis of viewpoint and deprived John of his clearly established rights to freedom of speech and expression secured by the First Amendment to the Constitution of the United States.

273. Defendants' violations are knowing, intentional, and without justification.

274. At all relevant times, Defendants were acting under color of state law.

275. Because of Defendants actions, John has suffered, and continues to suffer, irreparable injury that cannot be fully compensated by an award of money damages.

276. Defendants have damaged John by depriving him of his constitutional rights.

277. Pursuant to 42 U.S.C. §§ 1983 and 1988, John is entitled to an injunction invalidating and restraining enforcement of the Defendants' speech restrictive Policies and Procedures and other speech-restrictive policies.

25115612 v1

Additionally, John is entitled to the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order declaring Defendants' Policies and Procedures and actions unconstitutional in violation of John's constitutional rights, enjoining and restraining enforcement of Defendants' unconstitutional Policies and Procedures, awarding attorneys' fees and costs, and awarding such other and further relief that this honorable Court deems just and proper.

### Count VII. Violation of First Amendment as Facially Unconstitutional Pursuant to 42 U.S.C. § 1983 (Sarrubbo, Decker, & Romano)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, JOSEPH M. SARRUBBO JR., THOMAS DECKER, and JOYCE C. ROMANO, and in support thereof states as follows:

278. This is a cause of action for violations of civil rights under 42 U.S.C. § 1983 against Dean Sarrubbo, Decker, and Romano.

279. John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

280. John and all similarly-situated individuals have the right under the First Amendment of the U.S. Constitution to engage in constitutionally-protected speech.

25115612 v1

281.   Defendants are depriving John and all similarly situated individuals of their First Amendment rights by promulgating overbroad, vague, and facially unconstitutional policies and procedures.

282.   The Policies and Procedures are illegal under the Free Speech clause of the First Amendment. So long as the Policies and Procedures and the enforcement thereof continue to go unpunished, Defendants are causing ongoing and irreparable harm to John and others similarly situated.

283.   Defendants' Policies and Procedures, and in particular their definitions and descriptions of "sexual harassment," have a chilling effect on John's rights to freely and openly express his theories, ideas, and beliefs in a manner protected by Valencia policy, state law, and by the Constitution of the United States. By promulgating and enforcing the Policies and Procedures, Defendants have violated rights guaranteed to John by the First and Fourteenth Amendments to the Constitution of the United States. These rights and laws are clearly established by governing legal authority.

284.   The Policies and Procedures are vague and overbroad and discriminate on the basis of viewpoint. The Policies and Procedures also interfere with the right of free association, impose unconstitutional conditions on the receipt of state benefits, and constitute an illegal prior restraint on John's rights of free speech and assembly. These policies are therefore facially invalid under the Free

Speech clause of the First Amendment. So long as these policies survive, Defendants are causing ongoing and irreparable harm to the John and to every student and student organization at Valencia.

285.   By prohibiting, among other things, "verbal or physical conduct of a sexual nature" that "has the purpose or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive College environment," and by otherwise defining "sexual harassment" in a manner that is both vague and overbroad, Defendants have conditioned compliance with Valencia policies on the subjective emotional experience of the listener and have enacted regulations that limit and prohibit speech without providing any objective guidelines by which John can guide his behavior. Further, Defendants have explicitly and implicitly discriminated on the basis of viewpoint and deprived John of his clearly established rights to freedom of speech and expression secured by the First Amendment to the Constitution of the United States.

286.   At a minimum, Defendants' violations were knowing, intentional, and without justification.

287.   Defendants' actions were also fraudulent and malicious and showed willful and wanton disregard for John's rights.

288.   At all relevant times, Defendants were acting under color of state law.

289.   As a direct and proximate result of the Defendants' actions, John has suffered damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

290.   Defendants have damaged John by depriving him of his constitutional rights.

291.   Pursuant to 42 U.S.C. §§ 1983 and 1988, John is entitled to damages in an amount to be determined at trial, as well as punitive damages and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages, awarding punitive damages, awarding attorneys' fees and costs, and awarding such other and further relief that this honorable Court deems just and proper.

**Count VIII. Violation of First Amendment as Applied Pursuant to 42 U.S.C. § 1983 (Valencia & Board)**

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

292.   This is a cause of action for violations of civil rights under 42 U.S.C. § 1983 against Valencia and the Board.

293.   John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

294.   Defendants, acting under color of state law, have enacted policies and procedures that deprive John of his clearly established rights to freedom of speech and expression secured by the First Amendment to the Constitution of the United States.

295.   By prohibiting, among other things, "verbal or physical conduct of a sexual nature" that "has the purpose or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive College environment," and by otherwise defining "sexual harassment" in a manner that is both vague and overbroad, Defendants have explicitly and implicitly discriminated on the basis of viewpoint and deprived John of his clearly established rights to freedom of speech and expression secured by the First Amendment to the Constitution of the United States.

25115612 v1

296.   Because of Defendants' actions, John has suffered, and continues to suffer, irreparable injury which cannot be fully compensated by an award of money damages.

297.   Defendants have damaged John by depriving him of his constitutional rights.

298.   Pursuant to 42 U.S.C. §§ 1983 and 1988, John is entitled to an injunction and declaration that Defendants violated John's constitutional rights. Additionally, John is entitled to the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order declaring Defendants' Policies and Procedures and actions unconstitutional in violation of John's constitutional rights, enjoining and restraining enforcement of Defendants' unconstitutional Policies and Procedures, awarding attorneys' fees and costs, and awarding such other and further relief that this honorable Court deems just and proper.

### Count IX. Violation of First Amendment as Applied Pursuant to 42 U.S.C. § 1983 (Sarrubbo, Decker, & Romano)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, JOSEPH M. SARRUBBO JR., THOMAS DECKER, and JOYCE C. ROMANO, and in support thereof states as follows:

25115612 v1

299.   This is a cause of action for violations of civil rights under 42 U.S.C. § 1983 against Dean Sarrubbo, Decker, and Romano.

300.   John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

301.   Defendants, acting under color of state law, have enacted policies and procedures that deprive John of his clearly established rights to freedom of speech and expression secured by the First Amendment to the Constitution of the United States.

302.   By prohibiting, among other things, "verbal or physical conduct of a sexual nature" that "has the purpose or effect of unreasonably interfering with an individual's performance or creating an intimidating, hostile, or offensive College environment," and by otherwise defining "sexual harassment" in a manner that is both vague and overbroad, Defendants have explicitly and implicitly discriminated on the basis of viewpoint and deprived John of his clearly established rights to freedom of speech and expression secured by the First Amendment to the Constitution of the United States.

303.   As a direct, proximate, and foreseeable consequence of Defendants' conduct, John has suffered significant damages. John's academic and career prospects, earning potential, reputation, and physical and emotional well-being have all been severely harmed. John has suffered past and future economic losses,

72

loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

304. As a direct and proximate result of the Defendants' actions, John has suffered damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

305. Defendants' actions were fraudulent and malicious and showed willful and wanton disregard for John's rights.

306. Defendants have damaged John by depriving him of his constitutional rights.

307. Pursuant to 42 U.S.C. §§ 1983 and 1988, John is entitled to damages in an amount to be determined at trial, as well as punitive damages and the costs of this lawsuit, including his reasonable attorneys' fees.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages, awarding punitive damages, awarding attorneys' fees and

25115612 v1

costs, and awarding such other and further relief that this honorable Court deems just and proper.

### Count X. Breach of Contract (Valencia & Board)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

308. This is a cause of action for breach of contract against Valencia and the Board.

309. John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

310. Valencia's Policies and Procedures are a contract between John and Valencia.

311. The contract between John and Valencia requires Valencia to act in accordance with the Policies and Procedures in adjudicating reports of alleged violations of those Policies and Procedures.

312. The contract between John and Valencia requires Valencia to submit allegations of sexual harassment to a fair and impartial proceeding.

313. Valencia materially breached its contract with John by failing to comply with its obligations, standards, policies, and procedures set forth in the

74

Policies and Procedures in the course of the disciplinary process against John, and by subjecting him to a blatantly arbitrary and capricious disciplinary proceeding.

314.   As a direct, proximate, and foreseeable consequence of Valencia's conduct, John has suffered significant damages. John's academic and career prospects, earning potential, reputation, and physical and emotional well-being have all been severely harmed. John has suffered past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

315.   John is entitled to recover damages in an amount to be determined at trial, plus costs.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages, awarding costs, and awarding such other and further relief that this honorable Court deems just and proper.

## Count XI. Breach of the Covenant of Good Faith and Fair Dealing (Valencia & Board)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

25115612 v1

316.   This is a cause of action for breach of the covenant of good faith and fair dealing against Valencia and the Board.

317.   John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

318.   John and Valencia are parties to a written contract.

319.   The contract is ambiguous about the permissibility or scope of Valencia's investigation, adjudication, and appeals processes.

320.   Valencia, through a conscious and deliberate act, failed or refused to discharge their contractual responsibilities. Specifically, Valencia and the Board failed to provide John with a hearing before an impartial tribunal. Instead, Defendants subjected John to an inquisitorial, arbitrary, and capricious disciplinary procedure.

321.   Valencia's refusal to discharge their contractual responsibilities unfairly frustrated the contract's purpose and disappointed John's expectations.

322.   Valencia's breach of the contract deprived John of the contract's benefits.

323.   As a direct, proximate, and foreseeable consequence of Valencia's conduct, John has suffered significant damages. John's academic and career prospects, earning potential, reputation, and physical and emotional well-being have all been severely harmed. John has suffered past and future economic losses,

loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

324.   John is entitled to recover damages in an amount to be determined at trial, plus costs.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages, awarding costs, and awarding such other and further relief that this honorable Court deems just and proper.

## Count XII. Estoppel and Reliance (Valencia & Board)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

325.   This is a cause of action for estoppel and reliance against Valencia and the Board.

326.   John re-alleges and reincorporates the allegations in paragraphs 1 through 207  above as if fully set forth herein.

327. Through the Policies and Procedures, Valencia promised to provide John with a fair and impartial disciplinary proceeding if he were accused of a violation.

328. Valencia expected or reasonably should have expected these promises to induce reliance in the form of action by John. Specifically, Valencia expected or should have expected John, based on these express and implied promises, to accept Valencia's offer of admission, incur tuition and fee expenses, and choose not to attend other colleges.

329. John relied on these promise by choosing to enroll in and pay tuition to Valencia.

330. John relied on Valencia's promise to his detriment. When John was actually accused of a violation, he was subjected to a biased and procedurally deficient disciplinary process.

331. As a direct, proximate, and foreseeable consequence of Valencia's conduct, John has suffered significant damages. John's academic and career prospects, earning potential, reputation, and physical and emotional well-being have all been severely harmed. John has suffered past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

332.   John is entitled to recover damages in an amount to be determined at trial, plus costs.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages, awarding costs, and awarding such other and further relief that this honorable Court deems just and proper.

### Count XIII. Negligence (Valencia & Board)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

333.   John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

334.   This is an action for damages for negligence.

335.   Defendants had a duty, recognized by law, to conform to a certain standard of conduct to protect others against unreasonable risks. Defendants' duties included, without limitation, a duty of reasonable care in the conduct of the investigation of the allegations against John.

336. Defendants failed to conform their conduct to the standard required and breached their duty to John.

337. As a direct, proximate, reasonable, and foreseeable consequence of the Defendants' breach, John's academic and career prospects, earning potential, and reputation have been severely harmed.

338. As a direct, proximate, and foreseeable consequence of Defendants' conduct, John has suffered significant damages. John's academic and career prospects, earning potential, reputation, and physical and emotional well-being have all been severely harmed. John has suffered past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

339. As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial and the costs of this lawsuit.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects and other direct and consequential damages, and awarding costs and such other and further relief that this honorable Court deems just and proper.

25115612 v1

## Count XIV. Gross Negligence (Sarrubbo, Decker, & Romano)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, JOSEPH M. SARRUBBO JR., THOMAS DECKER, and JOYCE C. ROMANO, and in support thereof states as follows:

340.   This is an action for damages for gross negligence against Dean Sarrubbo, Decker, and Romano.

341.   John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

342.   Defendants had a duty, recognized by law, to conform to a certain standard of conduct to protect others against unreasonable risks. Defendants' duties included, without limitation, a duty of reasonable care in the conduct of the investigation of the allegations of sexual harassment against John.

343.   Together, the severity of the charges aimed at John, the consequences of being wrongly subjected to sanctions, and risk of an incorrect decision issued by an unfair and biased disciplinary proceeding were clear dangers.

344.   Defendants were aware of these dangers.

345.   Nevertheless, Defendants failed to exercise reasonable care in the conduct of the investigation of the allegations of sexual harassment against John. Specifically, Defendants submitted John to an unfair and biased disciplinary proceeding in which he was wrongly found responsible of charges such as

"physical abuse," despite the absence of any supporting evidence or even allegations to that effect.

346.   In conducting the Disciplinary Hearing and the Appeal, Defendants acted in bad faith and with a conscious indifference to the consequences to John.

347.   Defendants' breaches were the result of the Defendants' gross negligence.

348.   As a direct, proximate, reasonable, and foreseeable consequence of Defendants' numerous gross breaches, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

349.   As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, as well as punitive damages and the costs of this lawsuit.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and

professional opportunities, loss of future career prospects and other direct and consequential damages, awarding punitive damages, and awarding costs and such other and further relief that this honorable Court deems just and proper.

## Count XV. Defamation (Valencia & Board)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and THE VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

350. John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

351. This is an action for damages for defamation.

352. The Decision, which is now a permanent part of John's student record, contains false statements. Specifically, the Decision states that John committed "[p]hysical abuse, including but not limited to, rape, sexual assault, sex offenses, and other physical assault." John never committed any of these acts. Jane did not allege that John committed these acts, and no evidence considered by the Disciplinary Hearing supported these charges.

353. Defendants published the false statements by including them in the Decision, by placing the Decision in John's permanent student record, and by publishing false statements to third parties.

354.   The statements that Defendants published are defamatory, because they are false and injurious to John's reputation.

355.   Defendants were at a minimum negligent as to the falsity of the statements.

356.   The Decision and other published statements permanently damaged John's personal reputation in the State of Florida.

357.   As a direct, proximate, and foreseeable consequence of Defendants' conduct, John has suffered significant damages. John's academic and career prospects, earning potential, reputation, and physical and emotional well-being have all been severely harmed. John has suffered past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

358.   As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial and the costs of this lawsuit.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects and other direct and

consequential damages, and awarding costs and such other and further relief that this honorable Court deems just and proper.

### Count XVI. Invasion of Privacy (Valencia & Board)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

359. John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

360. This is an action for damages for invasion of privacy.

361. The allegations levied against John, Defendants' conclusions as to John's guilt, and the penalty that Dean Sarrubbo imposed on John and all are private facts and are not facts of a public nature.

362. Defendants disclosed these facts to third parties, for example Valencia's professors and employees.

363. Defendants disclosed these facts in bad faith and without any legitimate reason for doing so.

364. By publishing these facts, Defendants have unreasonably, substantially, and seriously interfered with John's privacy.

365. Defendants' publication of these private facts would be highly offensive to a reasonable person.

25115612 v1

366.   Defendants' publication of these private facts was highly offensive to John.

367.   As a direct, proximate, and foreseeable consequence of Defendants' conduct, John has suffered significant damages. John's academic and career prospects, earning potential, reputation, and physical and emotional well-being have all been severely harmed. John has suffered past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

368.   As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial and the costs of this lawsuit.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects and other direct and consequential damages, and awarding costs and such other and further relief that this honorable Court deems just and proper.

25115612 v1

**Count XVII. Intentional Infliction of Emotional Distress (Valencia & Board)**

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

369. John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

370. This is an action for damages for intentional infliction of emotional distress.

371. Defendants' imposition of life-altering sanctions on John after failing or refusing to provide him with a fair and impartial disciplinary proceeding was intentional or reckless.

372. Defendants knew or should have known that their actions would cause significant emotional distress to John.

373. Defendants' actions were outrageous, atrocious, utterly intolerable in a civilized community, and beyond all bounds of decency.

374. Defendants' actions directly and proximately caused John to suffer severe emotional distress. John is depressed and anxious. John has lost weight and is no longer able to sleep through the night.

375. As a direct, proximate, and foreseeable consequence of Defendants' conduct, John has suffered significant damages. John's academic and career

prospects, earning potential, reputation, and physical and emotional well-being have all been severely harmed. John has suffered past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

376. As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial and the costs of this lawsuit.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court enter an order awarding compensatory damages, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects and other direct and consequential damages, and awarding costs and such other and further relief that this honorable Court deems just and proper.

### Count XVIII. Declaratory Judgment (Valencia & Board)

COMES NOW, Plaintiff, JOHN DOE, by and through his undersigned counsel, and sues Defendants, VALENCIA COLLEGE and THE VALENCIA COLLEGE BOARD OF TRUSTEES, and in support thereof states as follows:

377. John re-alleges and reincorporates the allegations in paragraphs 1 through 207 above as if fully set forth herein.

378.  John seeks declaratory relief pursuant to Chapter 86, Florida Statutes, and 28 U.S.C. §§ 2201 and 2202.

379.  An actual, substantial, and continuing controversy exists between the parties, and a declaration of the parties' respective rights is necessary.

380.  John seeks a declaratory judgment that Defendants' actions violated Defendants' contractual obligations, Defendants' Policies and Procedures, federal and state law, and John's Constitutional rights.

WHEREFORE, Plaintiff, John Doe, respectfully requests that this honorable Court decide, declare, and adjudge that Defendants have violated Defendants' contractual obligations, Defendants' Policies and Procedures, federal and state law, and John's Constitutional rights; enjoin and restrain enforcement of Defendants' unconstitutional Policies and Procedures; order Defendants to reverse and expunge their findings of responsibility and sanctions from John's student record, to publicly state that Defendants have reversed and expunged the findings and sanctions, to verify this reversal and expungement of John's education record by providing John with a notarized letter confirming that the findings and sanction have been reversed and expunged from Plaintiff's education record; and award John the costs of this lawsuit as well as such other and further relief that this honorable Court deems just and proper.

89

## <u>DEMAND FOR JURY TRIAL</u>

381.  John requests that all matters related to liability and his damages be tried before a jury.

Dated this 23rd day of October, 2015.

Respectfully submitted,

_____
Howard S. Marks
Florida Bar No. 0750085
Email: hmarks@burr.com
Secondary: dmmorton@burr.com
Secondary:  mrannell@burr.com
Baya W. Harrison
Florida Bar No. 114085
Email: bharrison@burr.com
Secondary: dmmorton@burr.com
Burr & Forman, LLP
200 S. Orange Avenue, Suite 800
Orlando, FL 32801
Telephone: (407) 540-6600
Facsimile: (407) 540-6601
*Attorneys for Plaintiff*

90