**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JEFFREY KOEPPEL, individually,

       Plaintiff,

v.                                     Case No. 6:15-cv-1800-Orl-40DAB

THE DISTRICT BOARD OF TRUSTEES
OF VALENCIA COLLEGE, FLORIDA, et. al.

       Defendants.

_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AND FOR SUMMARY JUDGMENT (CORRECTED)[1]**

**I. PRELIMINARY STATEMENT**

The Motion of the District Board of Trustees of Valencia College, Florida ("Valencia"), Dr. Joyce C. Romano ("Romano"), Dr. Joseph M. Sarrubbo Jr. ("Sarrubbo") and Thomas Decker ("Decker") (collectively, "Defendants") to dismiss the Second Amended Complaint for failure to state a claim and for summary judgment ("Motion") should be denied in its entirety. Defendants' salacious and twisted rendition of the facts is merely an effort to distract the Court from the heart of Plaintiff Jeffrey Koeppel's ("Plaintiff") claims[2], namely to seek relief from Valencia's discriminatory investigation and determination of his student conduct proceeding in violation of basic standards of due process and Title IX of the Education Amendments.

Defendants would have the Court treat this as an "open and shut case" without any due regard for Valencia's own definitions and standards set out in its policies. In this same fashion, Defendants seek to win the instant case by converting its motion to dismiss into summary judgment by arguing that the text messages alone provided a solid basis for the decision and

---

[1] This Memorandum is being filed attaching the Declaration of Jeffrey Koeppel containing redacted exhibits.
[2] Plaintiff has attached as exhibit "A" to this Memorandum the Declaration of Jeffrey Koeppel with redacted exhibits. The paragraphs cited from the Declaration herein are referred to herein as the "Koeppel Decl. __".

sanctions. Such a shortsighted analysis is untenable here. The text messages attached to the Declaration of Joseph M. Sarrubbo ("Sarrubbo Decl.") are out of order, incorrectly time-stamped and do not accurately reflect the true record of events leading up to the incident in question. Defendants acknowledge the less than accurate text messages in a footnote to their Memorandum of Law. (Valencia Mem. p. 6, fn.2.) Even if the text messages at issue were accurately conveyed, Plaintiff's claims are not based solely on the text messages, and the text messages do not guide the Court's analysis of Plaintiff's claims under Title IX of the Education Amendments, 42 U.S.C. §1983 and the First Amendment.

Defendants presumed Plaintiff's guilt on the basis of his gender, and predetermined its findings based on text messages sent by the Plaintiff within a seventeen (17) minute window of time, after material provocation. Valencia's policies are overbroad and infringe on Plaintiff's First Amendment right to freedom of speech. Valencia's gender biased rush to judgment amounts to a deprivation of due process and a violation of Title IX of the Education Amendments.

## II. STATEMENT OF FACTS AS ALLEGED IN THE COMPLAINT[3]

### A. The Context Of Plaintiff's Relationship With Jane Doe

Plaintiff and Jane Doe were classmates in General Biology I at Valencia College during the Summer Semester from May 5, 2014 through July 28, 2014. (SAC ¶¶ 25-27.) Both Plaintiff and Jane Doe were non-traditional students; Plaintiff was 42-years-old and looking to embark on a career change into nursing, while Jane Doe was 24-years-old, and a single mother. (SAC ¶ 28; Koeppel Decl. ¶ 3.)

Over the course of three (3) months, Plaintiff and Jane Doe became study partners and friends. (SAC ¶¶ 33-34.) They communicated on a near-daily basis trading hundreds of text

---

[3] All references to the allegations contained in the Second Amended Complaint shall be referred to as SAC.

messages and emails. (SAC ¶ 36.) Their conversations covered topics outside of their schoolwork, including discussions about Jane's child, each of their prior relationships, and other personal topics. (SAC ¶ 35.) After studying together throughout the Summer Semester, Plaintiff and Jane's hard work paid off. When the grades were posted on July 28, 2014, Plaintiff learned that he had achieved the highest grade in the class and that Jane had attained the third highest grade. (SAC ¶ 45.) Plaintiff and Jane both enrolled in a physiology course for the fall semester to continue their studies together. (SAC ¶ 46.)

### B. The Text Messages At Issue Were Provoked By Jane Doe And Her Ex-Husband.

On August 3, 2014, after the Summer Semester had ended and before the Fall Semester had begun, at approximately 10:20 p.m., Plaintiff text messaged Jane Doe from his off-campus home. (SAC ¶ 47.) Plaintiff confided that he had a crush on Jane Doe and asked if she was still seeing her ex-husband. (SAC ¶ 49.) Unbeknownst to Plaintiff, Jane Doe's ex-husband was present with Jane Doe at the time and viewed Plaintiff's text messages. (SAC ¶¶ 48, 50.)

At 10:41 p.m., Jane Doe called Plaintiff to berate him for viewing her publicly available Facebook page and told him they were not friends. (SAC ¶ 51.) Jane Doe's ex-husband took the phone next and threatened Plaintiff, "I'm going to find you and kick your ass and get you kicked out of school! I'm going to enjoy knocking you to the ground." (SAC ¶ 52.) The call ended around ended at 10:57 p.m. (SAC ¶ 54.)

After Jane's ex-husband hung up the phone, Jane called Jeffrey a second time and berated him for two minutes until 11:00 p.m. (SAC ¶ 55.)

Following the phone calls, Jane's ex-husband called the Seminole County Sheriff's Office and reported that Jeffrey was "calling his wife's cell." (SAC ¶ 56.)

Feeling rejected, hurt and used by Jane Doe and threatened by her ex-husband, Plaintiff

sent a series of text messages to Jane Doe out of anger within a 17-minute window of time (the "Texts"). (SAC ¶¶ 58-59.) Plaintiff's text messages did not contain threats of violence or threats of bodily harm.

At 11:17 p.m., Plaintiff received a call from Deputy Brenton Rush of the Seminole County Sheriff's Office. (SAC ¶ 60.) Deputy Rush advised Plaintiff that the Sheriff's Office was taking no action in the matter because it was not criminal, and recommended that Plaintiff stop talking to Jane Doe. (SAC ¶ 60.) At no time was Plaintiff instructed or directed to cease contacting Jane Doe. (SAC ¶ 60.)

Hours later, feeling badly about their argument, Plaintiff text messaged Jane Doe to apologize and explained that her rebuff had hurt his feelings. (SAC ¶ 60.) He then wished her luck on the rest of her studies.  (SAC ¶ 60.) Plaintiff did not send 100 text messages following Deputy Rush's recommendation at 11:17 p.m.; he sent eleven (11) texts time-stamped after the 11:17 p.m. call, which were conciliatory.  (SAC ¶¶ 61, 165-166, 168, 184.)

## C. Valencia's Gender Biased Rush To Judgment

On August 13, 2014, Sarrubbo contacted Plaintiff to advise that Jane Doe filed a complaint against him that amounted to four conduct violations: (1) Physical abuse; (2) Sexual harassment; (3) Stalking; (4) Disorderly or lewd conduct (the "Charges"). (SAC ¶ 107.) Although Plaintiff had not yet been interviewed and no hearing had been held, Sarrubbo issued a no-contact order between Plaintiff and Jane Doe and Plaintiff was immediately dropped from enrollment in BSC 2093C / 15358 for the fall term 2014. (SAC ¶ 107.)

Plaintiff met with Sarrubbo and explained that he was provoked by Jane Doe and her ex-husband and that he felt hurt and used because of the context of their relationship up until that point. (SAC ¶¶ 115-117.) He denied sending Jane Doe any photos of him performing sexual acts with other women, and advised that Jane Doe initiated two phone calls to him that night. (SAC

4

¶¶ 57, 118.) He explained that Jane Doe's Facebook profile was publicly available and that he was not stalking her. (SAC ¶ 119.) Despite his explanations, Sarrubbo issued formal charges. (SAC ¶ 121.)

Plaintiff was not allowed to receive a copy of the allegations of Jane Doe's complaint despite his repeated requests to Sarrubbo and Valencia Security Department. (SAC ¶¶ 125-127.) Sarrubbo refused to explain or clarify Valencia's policies on Sexual Harassment for Plaintiff. (SAC ¶¶ 128, 136.) Jane Doe provided an incomplete set of text messages to Sarrubbo. (SAC ¶ 131.) Plaintiff sought to provide the full set of text messages, which was important to provide context, but he had previously deleted all of his text messages with Jane. (SAC ¶ 135.) Plaintiff informed Dean Sarrubbo that he would make every effort to retrieve those text messages to provide context for their communications.

A hearing was held to review the Charges ("Hearing") before a disciplinary committee composed of Dean Sarrubbo, Decker, Rafael Davila ("Davila"), Natalie Hofreiter, and a student member (the "Committee"). (SAC ¶ 139.) There were no witnesses present at the Hearing; neither Jane Doe nor her ex-husband were present. (SAC ¶ 141.)

Just before the Hearing began, Sarrubbo called a thirty-minute "pre-meeting" with the members of the disciplinary committee. *See*, Koeppel Decl. Exhibit 6.

After a brief introduction from Dean Sarrubbo, the Committee launched into cross-examination of Plaintiff where he was met with instant hostility. (SAC ¶¶ 144-145.) Five minutes into the Hearing, Decker stated aloud to the Committee, "I don't see what we need to discuss here. He was obviously stalking." Decker then stated directly to Jeffrey, "I'll be shocked, *shocked*, if you don't face criminal charges on this." (SAC ¶ 146.)

When Plaintiff attempted to explain that he was upset and hurt at Jane's sudden change in

attitude toward him after they had studied and socialized together for an entire semester, Decker retorted impatiently: "You're a forty-two-year-old man, you should just get over it!" (SAC ¶ 147.)

In utter disbelief that a male friend could offer to purchase a professional massage as a gift for a female friend, Davila questioned, "How could you have possibly thought it was appropriate to purchase [Jane] a massage? When was the last time you bought a massage for a male friend?" (SAC ¶ 148.) Sarrubbo shared in Davila's disbelief. (SAC ¶ 148.) The Committee's decision that the offer was inappropriate was gender-based.

In contravention of Valencia policies to provide accused students with the "opportunity to respond to the evidence," the Committee rebuffed Plaintiff's attempt to offer evidence of Jane Doe's acceptance of Plaintiff's gift (SAC ¶ 148); Plaintiff was foreclosed from making statements to fully defend the Charges (SAC ¶¶ 144, 153, 154); the Committee erroneously placed the burden of proof on Plaintiff to prove his innocence by asking him, "How could this *not* be sexual harassment?" and "What more would you have needed to do for these messages to rise to the level of sexual harassment?" (SAC ¶ 149); instead of considering evidence submitted by both parties, the Committee chose to rely on Jane Doe's cherry-picked evidence alone (SAC ¶ 150); and during Plaintiff's sole opportunity to address the Committee at the end of the Hearing, he was repeatedly cut short by Sarrubbo's demonstrated intent to end the Hearing, "I believe we have covered everything" (SAC ¶¶ 153, 154).

On August 26, 2014, Plaintiff was found responsible for all the Charges.

### D. Plaintiff's Appeal and Damages.

Plaintiff appealed the Decision to Romano on August 28, 2014. (SAC ¶ 179.) His appeal listed numerous procedural errors, including the lack of an impartial or fair process, the

6

Committee's failure to consider the totality of the relationship or text messages, and the Committee's misapprehension of the evidence and policy standards governing Sexual Harassment ("Appeal"). (SAC ¶ 180-185.) Valencia denied his Appeal on Sept 5, 2014 without explanation or rationale. (SAC ¶ 187.) As a result of Valencia's discriminatory actions, Plaintiff has suffered tremendous damages and faces significant losses to his future professional and educational endeavors. (SAC ¶¶ 197-207.)

## III. ARGUMENT

### A. THE LEGAL STANDARD GOVERNING MOTIONS TO DISMISS

This Court, in *Atlantica Holdings, Inc.*, 2014 WL 917055 * 4, reviewed the legal standard applicable to a motion to dismiss as follows[4]:

> In reviewing a motion to dismiss pursuant to Rule 12(b)(6), this Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Cohen v. Avande, Inc.*, 874 F.Supp.2d 315, 319 (S.D.N.Y. 2012) (citing *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). The Court will not dismiss any claims pursuant Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see, Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

### B. LEGAL STANDARD FOR THE CONVERSION OF A MOTION TO DISMISS INTO ONE FOR SUMMARY JUDGMENT

Summary judgment is only appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact. Federal Rule of Civil Procedure 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The

---

[4] In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *See, Id.* at 555; *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007); *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1226 (11th Cir. 2016); citing *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir.2012). *See also Baloco ex rel. Tapia v. Drummond Co., Inc.*, 640 F.3d 1338, (11th Cir. 2011). A Court is to consider a motion to dismiss in terms of the plaintiff's actual pleadings in the Complaint, and not in terms of a defendant's selective characterization of the facts. *Streit v. Bushell*, 424 F.Supp.2d633 (S.D.N.Y. 2006).

evidentiary standard that must be met by the movant is a high one, since a court is required to draw all inferences in favor of the non-moving party. On a motion for summary judgment, "all inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996); citing *Isenbergh v. Knight–Ridder Newspaper Sales, Inc.*, 84 F.3d 1380, 1383 (11th Cir.1996).

Generally, when converting a 12(b)(6) motion to one for summary judgment, all parties must be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. Fed .R. Civ. P. 12(b). Converting a motion to dismiss into a motion for summary judgment without allowing Plaintiff further opportunity to respond with additional facts would subvert the policy against "summary judgment by ambush." *In re Bayside Prison Litig.*, 190 F.Supp.2d 755, 760 (D.N.J. 2002).

A motion to dismiss may not be converted into one for summary judgment based on documents upon which the authenticity and accuracy are disputed. "[A] a document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed. 'Undisputed' in this context means that the authenticity of the document is not challenged." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); citing Fed.Rules Civ.Proc.Rules 12(b)(6), 56, 28 U.S.C.A.; also citing *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir.1999). *Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.1993).

Provided there is no dispute regarding the authenticity, accuracy or relevance of extrinsic documents, the Court may only consider same on a motion to dismiss if they are incorporated by reference or integral to the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d

Cir. 2010). It must also be clear that there are no material disputed issues of fact regarding the relevance of the documents. *Id.* An "integral" document, however, is not merely one that contains information quoted in the complaint; the document must be integral to the claim itself. *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 423 (S.D.N.Y. 2013).

As stated in the Declaration of Jeffrey Koeppel, the Texts submitted in <u>Exhibit L</u> to the Sarrubbo Decl. are not accurate representations of the events described in the Complaint, nor do they end the analysis of Plaintiff's claims under Title IX of the Education Amendments, 42 U.S.C. §1983 and the First Amendment. Plaintiff never received a copy of Jane Doe's handwritten complaint during his disciplinary process, contained in <u>Exhibit A</u> to the Sarrubbo Decl. (Koeppel Decl. ¶¶ 16, 22.) Sarrubbo's "Phone Call log, Notes Log and Meeting Log" contained in <u>Exhibit C</u> do not accurately convey the reported events or motivation of the Seminole County Sheriff's Office. (Koeppel Decl. ¶¶ 10, 30.) The evidence submitted by Defendants consists of incomplete disputed documents that may not be considered by the Court on Defendants' converted motion for summary judgment. *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999).

Whether Valencia discriminated against Plaintiff on the basis of his male gender or deprived him of due process are facts "more appropriate for development through discovery." *Daly v. Norfolk S. Ry. Co.*, No. CIV. 09-4609 WJM, 2010 WL 3310715, at *2 (D.N.J. Aug. 19, 2010). The appropriate standard of review of Plaintiff's claims is whether the Second Amended Complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. at 570, 127 S.Ct. 1955.

## C. PLAINTIFF INTENDS TO WITHDRAW WITHOUT PREJUDICE ALL STATE LAW CLAIMS

As Plaintiff's intended Third Amended Complaint will reflect, he does not seek to pursue

9

his causes of action for breach of contract (Count X), breach of covenant of good faith and fair dealing (Count XI), estoppel and reliance (Count XII), negligence (Count XIII), gross negligence (Count XIV), defamation (Count XV), invasion of privacy (Count XVI), and intentional infliction of emotional distress (Count XVII).  As a result, Defendants' argument on pgs. 11-13 and 24 is moot.

### D. THE COMPLAINT STATES A CLAIM OF GENDER DISCRIMINATION UNDER TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

The allegations of the Second Amended Complaint taken as a whole, state a Title IX claim sufficiently and give rise to a plausible inference of gender bias.

#### 1. The Controlling Title IX Standard.

In *Yusuf v. Vassar College*, 35 F.3d at 715, the Second Circuit observed that attacks on student conduct proceedings on grounds of gender bias can be expected to fall generally within two categories – erroneous outcome and selective enforcement. The *Yusuf* standard is still applied and used as the controlling legal standard for a cause of action under Title IX by other district courts.  *See, Prasad v. Cornell University*, Civ. No. 15-cv-00322 (N.D.N.Y. Feb. 24, 2016); *Doe v. Brown Univ.*, No. CV 15-144 S, 2016 WL 715794 (D.R.I. Feb. 22, 2016); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 765 (D. Md. 2015); *John Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015); *Wells v. Xavier Univ.*, 2014 WL 972172 (S.D. Ohio Mar. 12, 2014); *see also, Williams v. Franklin & Marshall College*, 2000 WL 62316 at *2 (E.D. Pa. 2000).

A Title IX claim is stated when it is alleged that the application of gender-neutral policies and practices has been influenced by gender stereotypes. *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 295 (2d Cir. 2004) (citing *Cohen v. Brown Univ.*, 101 F.3d 155, 178-79 [1st Cir. 1996]). To this end, the court in *Cohen* stated:

> To assert that Title IX permits institutions to provide fewer athletics participation opportunities for women than for men, based upon the premise that women are less interested in sports than are men, is (among other things) to ignore the fact that Title IX was enacted in order to remedy discrimination that results from stereotyped notions of women's interests and abilities. Interest and ability rarely develop in a vacuum; they evolve as a function of opportunity and experience.... [T]o allow a numbers-based lack-of-interest defense to become the instrument of further discrimination against the underrepresented gender would pervert the remedial purpose of Title IX.

101 F.3d 155 at 178-79; *see also, Bleiler v. Coll. of Holy Cross*, No. CIV.A. 11-11541-DJC, 2013 WL 4714340, at *5 (D. Mass. Aug. 26, 2013) ("'The 'archaic assumptions' standard, which has been applied where plaintiffs seek equal athletic opportunities, finds discriminatory intent in actions resulting from classifications based upon archaic assumptions about gender").

When decisions are based on invidious sex stereotypes, a reasonable jury could infer the existence of discriminatory intent. *Sassaman v. Gamache*, 566 F.3d 307, 313 (2d Cir. 2009) (analyzing gender discrimination under Title VII)[5]. At the pleading stage a plaintiff need only allege facts to give plausible support to a minimal inference of discriminatory motivation. *Littlejohn v. City of New York*, No. 14-1395-CV, 2015 WL 4604250, at *8 (2d Cir. Aug. 3, 2015).

### 2. Plaintiff Has Stated A Claim Under Title IX – Erroneous Outcome.

#### a. Plaintiff Has Cast Articulable Doubt On The Accuracy Of The Outcome

To sustain an erroneous outcome claim, plaintiff must allege facts sufficient to cast articulable doubt on the accuracy of the outcome of the disciplinary proceeding. *Yusuf*, 35 F.3d at 715. This may be done through allegations of evidentiary weaknesses in the student conduct process, investigative failures to question witnesses about the victim's state of mind, accepting the victim's account of her state of mind despite numerous statements to the contrary,

---

[5] Since Title IX was modeled after Title VI and VII of the Civil Rights Act of 1964, courts regularly consider Title VI and VII legal precedent as guidance for the application of Title IX. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 678, 99 S. Ct. 1946, 1948, 60 L. Ed. 2d 560 (1979).

misconstrued and misquoted witnesses' statements, drawing prejudicial conclusions without sufficient evidentiary support, and casting Plaintiff's actions in highly inflammatory terms. *Prasad*, Civ. No. 15-cv-00322; *Doe v. Brown Univ.*, 2016 WL 715794 at *3 (despite extensive evidence of consent including John Doe's statement, corroborating witnesses, Jane Doe's concessions in her testimony of providing consent and significant issues with Jane Doe's credibility, John Doe was found responsible of non-consensual digital penetration).

The argument that Plaintiff "affirmatively acknowledges that he sent his subject texts to Jane" (Valencia Mem. 14) belies the allegations of the Second Amended Complaint. Plaintiff contests the fact that Plaintiff "sent 100 inappropriate text messages" after Deputy Rush advised Jeffrey to no longer contact Jane (SAC ¶¶ 165-166, 168, 184, 187; Koeppel Decl. ¶ 11.) There was no "six-hour barrage of vulgar, sexual and degrading texts messages." (Valencia Mem. p. 1.) The texts at issue amount to about several text messages sent in a 17-minute window of time (SAC ¶ 59.) The messages were provoked by Jane Doe's yelling, and Jane Doe's ex-husband who, just moments prior, threatened Plaintiff's life and educational future. (SAC ¶¶ 51-57; Koeppel Decl. ¶ 18.) Valencia's rush to judgment ignored the full context of Plaintiff and Jane Doe's relationship, which Plaintiff unsuccessfully attempted to bring to Valencia's attention. (SAC ¶¶ 137, 150, 157; Koeppel Decl. ¶¶ 34, 36.)  Valencia based its decision on a complete fabrication, namely, that Plaintiff "sent 100 inappropriate text messages into the early morning hours of Monday, August 4, 2014" (SAC ¶¶ 165, 166.) However, the record, even as provided by Jane Doe, does not support this exaggerated number of text messages. (SAC ¶¶ 61, 165-166, 168, 184; Exhibit 1 to Koeppel Decl.)  Yet, the decision was affirmed on appeal by Romano on the same erroneous grounds (SAC ¶ 184.) Defendants turn Plaintiff's allegations into an admission of guilt for all of the Charges.

Contrary to Valencia's policies on Physical Abuse, the Texts do not threaten violence to Jane Doe. (SAC ¶ 96; Koeppel Decl. ¶ 9.) The Texts do not constitute Sexual Harassment when analyzed under Valencia's full definition in its policies, since the record does not reflect that the conduct had "the purpose or effect of unreasonably interfering with" Jane Doe's performance or that any consideration was "given to the record of the incident as a whole and to the totality of the circumstances, including the context in which the alleged incidents occurred" (SAC ¶ 96; Koeppel Decl. ¶¶ 33, 35); *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 667, 119 S. Ct. 1661, 1683, 143 L. Ed. 2d 839 (1999). Similarly, the record cannot support that the Texts were "sufficiently serious to cause physical, emotional, or psychological fear or distress" or that the Texts "served no legitimate purpose." (SAC ¶ 96.) The lack of any definition in Valencia's policies for what constitutes Disorderly or Lewd Conduct (SAC ¶ 96) demonstrates how arbitrary and capricious Valencia acted in order to find him responsible of same.

Unlike the unprovoked "fuck you" text messages sent in *Marshall v. Ohio University*, No. 2:15-CV-775, 2015 WL 1179955, at *4 (S.D. Ohio Mar. 13, 2015), the Texts here were instigated by Jane Doe's tirade of calls to Plaintiff and her ex-husband's verbal threats to Plaintiff's life and educational future. (SAC ¶¶ 51-57; Koeppel Decl. ¶ 18.) The record does not support a disruption in Jane Doe's academic environment unlike the complainant in *Marshall*.

Valencia's determination that Plaintiff committed Physical Abuse, Sexual Harassment, Stalking and Disorderly or Lewd Conduct is not supported by the record and was clearly erroneous.

### b.  The Erroneous Outcome Was Motivated By Plaintiff's Male Gender

The kind of allegations supporting a Title IX sex discrimination claim may include, but is not limited to, gender biased statements by members of the disciplinary tribunal or pertinent

university officials, or patterns of decision-making that showed the influence of gender bias. *Yusuf*, 35 F.3d at 715.

Valencia cites to *Sahm v. Miami University*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) to argue that Plaintiff has not alleged a causal link between the statements made during his hearing and gender bias. (Valencia Mem. 14.) But unlike the plaintiff in *Sahm* who failed to allege that any members of the disciplinary tribunal made statements indicating gender bias, the Second Amended Complaint states:

> Decker stated aloud to the Committee, "I don't see what we need to discuss here. He was obviously stalking." Decker then stated directly to Jeffrey, "I'll be shocked, *shocked*, if you don't face criminal charges on this." (SAC ¶ 146.)

> When Plaintiff attempted to explain that he was upset and hurt at Jane's sudden change in attitude toward him after they had studied and socialized together for an entire semester, Decker retorted impatiently: "You're a forty-two-year-old man, you should just get over it!" (SAC ¶ 147.)

> Davila questioned, "How could you have possibly thought it was appropriate to purchase [Jane] a massage? When was the last time you bought a massage for a male friend?" (SAC ¶ 148.)

> The Committee erroneously placed the burden of proof on Plaintiff to prove his innocence by asking him, "How could this *not* be sexual harassment?" and "What more would you have needed to do for these messages to rise to the level of sexual harassment?" (SAC ¶ 149.)

It would be a mistake to rely on *Sahm*, which has been distinguished by a more recent case, *Doe v. Brown Univ.*, No. CV 15-144 S, 2016 WL 715794, at *10 (D.R.I. Feb. 22, 2016) (disagreeing with Brown's reliance on *Sahm*, which relied on cases that were deciding summary judgment, not a motion to dismiss). Plaintiff's allegations of gender-based statements by the Committee, combined with Valencia's ignorance and outright rejection of salient evidence in support of Plaintiff and the lack of due process he received are sufficient to get Plaintiff discovery, including depositions. *Doe v. Brown Univ.*, 2016 WL 715794 at *10.

Plaintiff's case is more akin to *Prasad* and *Doe v. Washington & Lee University*, where Sarrubbo had considerable influence over the outcome of Plaintiff's disciplinary proceeding. Civ. No. 15-cv-00322 at *32 ("Thus, unlike the situation in *Doe v. Columbia*, Plaintiff presents facts plausibly suggesting that the fact finders' determinations turned on the investigators' report of the evidence"); 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (Bias on the part of Ms. Kozak is material to the outcome of John Doe's disciplinary hearing due to the considerable influence she appears to have wielded in those proceedings); *see also*, *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004) (impermissible bias of a single individual at any stage of the process may taint the ultimate employment decision, even absent evidence of illegitimate bias on the part of the ultimate decision maker, as long as such individual played a meaningful role in the process).

In initiating the Charges against Plaintiff (SAC ¶ 107), Sarrubbo failed to embark on any "investigation" into Jane Doe's allegations, taking her incomplete text messages at face value and viewed in a vacuum and immediately dropping Plaintiff from one of his classes. Sarrubbo's refusal to explain the application of Valencia's Sexual Harassment policies to Plaintiff, provide him with a copy of Jane Doe's complaint or acknowledge the more complete version of text messages provided by Plaintiff indicate his bias in favor of Jane Doe. (SAC ¶¶ 125-127, 128-129, 136, 15, 157.) In furtherance of his bias, Sarrubbo grossly mischaracterized the number of Texts as "100 inappropriate text messages" and falsely claimed that Deputy Rush directed Plaintiff to cease contacting Jane Doe.   (SAC ¶¶ 165-166; Koeppel Decl. ¶ 11.)   The Committee's determination was not independent of Sarrubbo's gender bias, as he chaired the Committee and was present during the 30-minute pre-hearing meeting and the Committee's deliberations, to ensure a guilty outcome.   (SAC ¶ 139.) The Committee did not consider the

"totality of the circumstances" or the entire context of the Texts. (Koeppel Decl. ¶¶ 36, 37, & 38.) Plaintiff's entire process was tainted by Sarrubbo's gender bias, and was deprived of any meaningful opportunity to defend against the Charges during the Hearing.

The allegations of the Second Amended Complaint support an erroneous outcome motivated by gender bias in light of Valencia's differential treatment of Plaintiff and Jane Doe. Jane Doe was allowed to have her text messages considered, but Plaintiff's more complete version of the text messages were ignored. Sarrubbo grossly mischaracterized Plaintiff's actions by stating "However, you chose not to take the advice of a sworn law enforcement professional. Instead, you sent Jane approximately 100 inappropriate text messages into the early morning hours of Monday, August 4, 2014" so as to support a finding of "responsible" for the Charges (SAC ¶¶ 165-166.) In contravention of its Sexual Harassment policies, Valencia did not consider the entire context of the parties' relationship/friendship or the fact that Jane Doe and her ex-husband provoked Plaintiff's 17-minute text argument. (SAC ¶¶ 165-166.)  There is also no record of any academic disruption to Jane Doe as a result of the Texts. *Marshall*, 2015 WL 1179955 at *4.

Given the requirements of proving a Title IX claim, it would be prejudicial to require Plaintiff, at this pre-discovery phase, to support his claim with evidence of gender bias that will largely come from deposition testimony of the Disciplinary Committee members, and/or student records that are currently being withheld under The Family Educational Rights and Privacy Act (FERPA). Fed. R. Civ. P. 56 (d). At the pleading stage, the foregoing allegations are more than sufficient to demonstrate a plausible connection between gender bias and the outcome of John Doe's disciplinary proceeding. *Doe v. Salisbury Univ.*, 123 F. Supp. 3d at 768-69; *Doe v. Brown Univ.*, 2016 WL 715794 at *8 (Requiring the male student to conclusively demonstrate, at

16

the pleading stage, with statistical evidence or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with standard used in other discrimination contexts); *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 506-07, 122 S. Ct. 992, 994-95, 152 L. Ed. 2d 1 (2002); *Weser v. Glen*, 190 F.Supp.2d 384, 395 (E.D.N.Y.) ("[s]tatistics may be used as circumstantial evidence to support an individual disparate treatment claim"); *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 432 (S.D.N.Y. 2014) (in most cases, plaintiffs will be unable to provide reliable statistics before they have access to discovery); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 14 (1st Cir. 2011); *Marrerro-Rodriguez v. Municipality of San Juan*, 677 F.3d 497, 502 (1st Cir. 2012).

## E. PLAINTIFF HAS STATED CLAIMS UNDER 42. U.S.C. § 1983 FOR DUE PROCESS VIOLATIONS

### 1. Valencia Violated Plaintiff's Substantive Due Process Right to Public Education

The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." Pursuant to the Fourteenth Amendment, a student enjoys property and liberty interests in a public education. *Goss v. Lopez*, 419 U.S. 565, 574, 95 S. Ct. 729, 736, 42 L. Ed. 2d 725 (1975); *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988). The Due Process Clause forbids arbitrary deprivations of liberty where his good name, reputation, honor, or integrity is at stake because of the government's actions. *Goss*, 419 U.S. at 574, 95 S. Ct. at 736.

As applied to a student's right to post-secondary public education, the U.S. Supreme Court and the Eleventh Circuit have not established otherwise. *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 513, 88 L. Ed. 2d 523 (1985) (assuming the right exists, but finding no substantive due process violation where decision was not a substantial departure from accepted academic norms where it was made with careful deliberation, based on

17

an evaluation of the entirety of Ewing's academic career); *Haberle v. Univ. of Alabama in Birmingham*, 803 F.2d 1536, 1540 (11th Cir. 1986) (*Ewing* confirms that, in the absence of an improper motive, an academic dismissal must be "such a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment," before it will be overturned on substantive due process grounds).

Under *Haberle*, Plaintiff has stated a claim against Valencia for the violation of his substantive due process rights to continued, uninterrupted enrollment at Valencia College, a public post-secondary institution in Florida.   Before confirming the full text message conversation at issue or receiving Plaintiff's version of the allegations, Valencia dropped Plaintiff from one of his enrolled courses, BSC 2093C / 1535, and issued a no-contact order against him as "interim measures." (SAC ¶ 107.) Plaintiff was not provided with a copy of Jane Doe's complaint, despite his repeated requests. (SAC ¶¶ 125-127.) There was no clear understanding of the charges Plaintiff was facing, or how they applied to him based on the one-sentence allegation he was given.  (SAC ¶¶ 125-127.) Sarrubbo and Decker's failure to review the complete exchange of text messages prior to, during and after the incident was a substantial departure from accepted standards according to Valencia's own policies. (SAC ¶¶ 130-132, 137, 150, 157.) Despite overwhelming evidence submitted by Plaintiff, the Committee came to the hearing with a predetermination of guilt against Plaintiff (SAC ¶ 146.) The decision was not based on the totality of circumstances.  (SAC ¶¶ 96, 168.)

## 2. Valencia Violated Plaintiff's Procedural Due Process Rights

### a. Plaintiff Did Not Receive Adequate Notice Or A Meaningful Opportunity To Be Heard

At a public university, a student facing serious charges of misconduct and exposure to substantial sanctions is entitled to receive notice and a fundamentally fair hearing. *Gomes v.*

26243625v1

*Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 16 (D. Me. 2005). Minimum due process requirements must be satisfied in cases involving a charge of sexual assault, which can implicate a person's good name, reputation, honor and integrity. *Goss,* 419 U.S. at 574, 95 S.Ct. 729 (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)). A finding of guilt can "have a major immediate and life-long impact on [their] personal life, education, employment, and public engagement." *Goss,* 419 U.S. at 574, 95 S.Ct. 729.

Courts have recognized the following minimum due process requirements owed to students facing major disciplinary charges:

> (1) [T]he student must be advised of the charges against him; (2) he must be informed of the nature of the evidence against him; (3) he must be given an opportunity to be heard in his own defense; and (4) he must not be punished except on the basis of substantial evidence.

*Gomes*, 365 F. Supp. 2d at 15-16 (citing *Keene v. Rodgers,* 316 F.Supp. 217, 221 (D.Me. 1970) (quoting Charles Alan Wright, *The Constitution on the Campus,* 22 Vand. L.Rev. 1027, 1071–72 (1969)).

Additionally, the *Keene* court added: 1) the student must be permitted the assistance of a lawyer, at least in major disciplinary proceedings; 2) he must be permitted to confront and to cross-examine the witnesses against him; and, 3) he must be afforded the right to an impartial tribunal, which must make written findings. *Id.* (citations omitted); *see also Carey ex rel. Carey v. Maine Sch. Admin. Dist. No. 17,* 754 F.Supp. 906, 919 (D.Me. 1990) (setting forth seven minimum requirements which must be observed in student disciplinary hearings to assure requisite balance). Students have the right to counsel and the right to confront and examine adverse witnesses during a disciplinary hearing involving serious charges. *See, Givens v. Poe,* 346 F.Supp. 202 (W.D.N.C. 1972) (students have rights to counsel and to confront and examine adverse witnesses); *Fielder v. Board of Education,* 346 F.Supp. 722 (D.Neb.1972) (right to

19

cross-examine constitutionally required; right to counsel and cross-examination by counsel is at least "good technique"). In *Mills v. Board of Education,* 348 F.Supp. 866 (D.D.C.1972), the court prescribed hearing procedures for a class of young special needs students that included the right to a representative, which could be legal counsel, and the right of the parent or guardian, *or* his representative, to confront and cross-examine witnesses. In *Marin v. University of Puerto Rico,* 377 F.Supp. 613 (D.P.R. 1974), the court held that *the students* were entitled to cross-examine opposing witnesses with the assistance of retained counsel.

In *Doe v. Rector & Visitors of George Mason Univ.*, the University violated the accused's due process rights by not providing notice of the full scope of the factual allegations at issue; deviating from its own procedures; not affording John Doe an adequate opportunity to mount an effective defense; and not providing the basis for its decision, thereby foreclosing any meaningful review. No. 1:15-CV-209, 2016 WL 775776, at *12 (E.D. Va. Feb. 25, 2016). The disciplinary proceeding employed by Valencia was rife with the same due process failures.

Valencia's "notice" of the Charges on August 13, 2014 was wholly deficient and lacking. The listing of charges, Physical Abuse, Sexual Harassment, Stalking and Disorderly or Lewd Conduct, contained inapplicable definitions to allegations or failed to contain a definition at all, Plaintiff did not understand how the Charges applied to his case, and Sarrubbo failed to provide any explanation. (SAC ¶¶ 97, 107; Koeppel Decl. ¶¶ 14, 28.) Despite repeated requests to Sarrubbo, Plaintiff did not receive a copy of Jane Doe's complaint during the process. (SAC ¶¶ 125-127; Koeppel Decl. ¶¶ 16, 22.) This was especially significant given that the summary of allegations contained in the August 13, 2014 "notice" was only one sentence long and inaccurate in that Jane Doe, not Plaintiff, initiated two phone calls on the evening in question. (SAC ¶ 75; Koeppel Decl. ¶¶ 18, 22.) Plaintiff did not make physical contact with Jane Doe that night and

26243625v1

the summary of allegations did not indicate any physical conduct complained of, which led to further confusion and lack of notice as to the nature of the charge of "Physical Abuse" against him. (SAC ¶ 63; Koeppel Decl. ¶ 9.)

Plaintiff did not receive a fundamentally fair hearing; he was deprived of a meaningful opportunity to be heard in his defense. Plaintiff was denied the right to confront or cross examine Jane Doe or any other witness, namely Jane Doe's ex-husband or her father; yet statements by all three witnesses were being used against Plaintiff. (SAC ¶¶ 130, 159, 160; Koeppel Decl. ¶ 25.) Sarrubbo's failure to provide Plaintiff with a copy of Jane Doe's complaint foreclosed Plaintiff's ability to effectively and fully prepare and be heard in his defense. (SAC ¶¶ 125-127; Koeppel Decl. ¶ 19.) Sarrubbo and Decker's failure to review the complete exchange of text messages prior to, during and after the incident was a departure from accepted standards according to Valencia's own policies. (SAC ¶¶ 130-132, 137, 150, 157; Koeppel Decl. ¶ 34.) Merely five (5) minutes into the hearing, Decker indicated his pre-disposition to find Plaintiff responsible for the Charges, "I don't see what we need to discuss here. He was obviously stalking" and "I'll be shocked, *shocked*, if you don't face criminal charges on this." (SAC ¶ 146.) Sarrubbo and Davila angrily asked Plaintiff to explain how the Texts *did not* constitute sexual harassment, which placed the burden of proving his innocence on Plaintiff. (SAC ¶ 149.) Plaintiff was interrogated for thirty (30) minutes straight with questions that indicated the Committee's lack of training or grasp of the full evidence, then deprived of any meaningful opportunity to speak freely in his defense before he was quickly waved off. (SAC ¶¶ 151-154.) The Committee refused to consider the totality of the text message evidence submitted by Plaintiff and precluded Plaintiff from defending against false allegations contained in Jane Doe's complaint. (SAC ¶¶ 146, 155-158; Koeppel Decl. ¶ 36.) Plaintiff's hearing did not provide for any informal give-and-take to allow

21

Plaintiff the "opportunity to characterize his conduct and put it in what he deems the proper context." *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 85-86, 98 S. Ct. 948, 953, 55 L. Ed. 2d 124 (1978) (citing *Goss*, 419 U.S. at 583, 95 S. Ct. at 741).

The Committee failed to provide a basis for its decision, thereby foreclosing any meaningful review. (SAC ¶ 146); *Doe v. Rector & Visitors of George Mason Univ.*, 2016 WL 775776 at *12. Instead, the decision identified false information that appeared to have an impact on the Committee's decision, "However, you chose not to take the advice of a sworn law enforcement professional. Instead, you sent Jane approximately 100 inappropriate text messages into the early morning hours of Monday, August 4, 2014." (SAC ¶ 168; Koeppel Decl. ¶ 11.) Valencia's finding violated Plaintiff's due process rights guaranteed by the Fourteenth Amendment.

### 3. Sarrubbo, Romano and Decker Are Not Entitled To Qualified Immunity

#### a. Plaintiff's Rights To Due Process Were Clearly Established

Valencia is simply wrong when it argues that a student's right to public education is not clearly established. (Valencia Mem. 17.); *Goss v. Lopez*, 419 U.S. 565, 574, 95 S. Ct. 729, 736, 42 L. Ed. 2d 725 (1975). In *Goss*, the Supreme Court held that a student enjoys property and liberty interests in a public education pursuant to the Fourteenth Amendment, the Goss court did not identify any limitation to the right being drawn as it relates to post-secondary public education. 419 U.S. 565, 574, 95 S. Ct. 729, 736, 42 L. Ed. 2d 725. Minimum due process requirements, including notice and a fundamentally fair hearing during the disciplinary process, must be satisfied in cases involving a charge of sexual misconduct, which can implicate a person's good name, reputation, honor, and integrity. *Goss v. Lopez*, 419 U.S. 565, 574, 95 S. Ct. 729, 736, 42 L. Ed. 2d 725 (1975); *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 16 (D. Me.

2005). Notice satisfies due process only if the student had sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing. *Jaksa v. Regents of Univ. of Michigan*, 597 F. Supp. 1245, 1250 (E.D. Mich. 1984) *aff'd*, 787 F.2d 590 (6th Cir. 1986) (The hearing was held approximately six weeks after plaintiff was advised of the charges against him, and therefore, he had sufficient time to prepare his defense).

Echoing the due process rights set forth by *Goss*, the Eleventh Circuit recognized a student's clearly established right to continued enrollment at a state university in *Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012) (no qualified immunity where student's property interest in his continued enrollment at the university, and his entitlement to some predeprivation process, were clearly established when he was expelled for alleged threatening behavior).

Valencia's own policies put Sarrubbo, Romano and Decker on notice of Plaintiff's due process rights to a fundamentally fair hearing. (SAC ¶ 104) ("...the purpose of this disciplinary process is to provide a fair review of alleged violations of this Code...").

At all relevant times, Sarrubbo was Dean of Students and in charge of Plaintiff's disciplinary process. (SAC ¶ 13.) As Dean of Students, Sarrubbo performed the initial investigation into Jane's accusation, determined whether to charge Plaintiff with a violation, whether to convene a student conduct committee, whether to find Plaintiff guilty or innocent, and what sanctions to impose against Plaintiff. (SAC ¶ 106.) Sarrubbo was aware that John Doe was entitled to sufficient notice and a meaningful opportunity to be heard, which included a meaningful opportunity to prepare for his defense. Prior to the start of the hearing, Sarrubbo emailed the members of the Committee to meet thirty minutes prior to the hearing, "We have A LOT to go over before we meet with [Jeffrey] at 2:00 PM." Dean Sarrubbo copied third parties in this message." (SAC ¶ 140.) *See*, Koeppel Decl. Exhibit 6. Sarrubbo and Decker knew charges

26243625v1

of physical abuse, sexual harassment and stalking would implicate Plaintiff's good name, reputation, honor and integrity.

Yet, Plaintiff was deprived of any meaningful opportunity to prepare his defense or be heard at his hearing. Plaintiff had no meaningful opportunity to review or defend against Jane Doe's complaint or the Charges, and Plaintiff's appeal was denied despite the lack of due process.

The Defendants reliance on *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) and *Wilhem v. Fla. A & M Univ. College of Law*, Case No. 6:07-CV-218-Orl-19KRS, 2007 WL 1482022, M.D. Fla. Mar. 7, 2007) for the argument that this Court is without jurisdiction as to Count 2 against the individual Defendants because the Plaintiff was required to seek a state court remedy first is misplaced. *Beckwith v. City of Daytona Beach Shores, Fla.* provides helpful analysis on whether or not *McKinney* is applicable here. "[E]ven though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis *that infringes his constitutionally protected interests— especially, his interest in freedom of speech...McKinney* has no impact on such claims (emphasis added). *Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1563 (11th Cir. 1995); quoting *Perry v. Sindermann*, 408 U.S. 593 at 597 (1972). Here, the Plaintiff was denied his property and liberty interest in his continued enrollment in Valencia based upon speech that Valencia determined to be objectionable in an arbitrary and capricious proceeding. The infringement of Plaintiff's right to free speech under the First Amendment takes this case out of the purview of *McKinney* and provides Federal subject matter jurisdiction. In the event that the Court finds for the Defendants' on this issue, the Court should allow the Plaintiff to amend its

24

claims order to further clarify the First Amendment issue.

### b.  Defendants' Roles Were Critical To The Decision

As discussed in Section D (2)(a), *supra*, Sarrubbo exercised considerable influence over the outcome of Plaintiff's disciplinary proceeding. *Prasad*, Civ. No. 15-cv-00322, at *32; *Doe v. Washington & Lee*, 2015 WL 4647996 at *10. Sarrubbo and Decker were designated decision-makers in Plaintiff's case, and Romano sustained the decision on appeal. Sarrubbo directed the decision in the disciplinary proceeding by his slanted investigation and misreported number of relevant text messages, by the timelines he established, and by the evidence he chose to submit. Any prospective relief granted in this action will necessarily be directed to Sarrubbo, Decker and/or Romano due to their roles with respect to Plaintiff's disciplinary decision.

Defendants' motion for summary judgment to dismiss Plaintiff's due process claims under 42 U.S.C. § 1983 should be denied given the lack of any formal discovery or depositions in this action, and in light of the fact that the testimony of the Disciplinary Committee members will be critical to establishing his due process claims. Fed. R. Civ. P. 56 (d).

### F.  VALENCIA'S POLICIES ARE FACIALLY OVERBROAD IN VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS

A school's power to discipline its students for speech that may constitute sexual harassment is circumscribed by the First Amendment. *Davis*, 526 U.S. at 667, 119 S. Ct. at 1683.

Generally, the standard for regulating on-campus speech is whether it materially and substantially interferes with the requirements of appropriate discipline in the operation of the school. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509, 89 S. Ct. 733, 738, 21 L. Ed. 2d 731 (1969) (record evidence failed to support a substantial interference with the rights of other students, and there was no reference to any anticipated disruption). While exceptions to the "material and substantial interference" standard have been made for lewd or vulgar speech,

such limitations involved on-campus speech that had a demonstrable impact on the student body. *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 685, 106 S. Ct. 3159, 3165, 92 L. Ed. 2d 549 (1986) (Facing a high school assembly comprised of 600 high school students, many of whom were 14-years-old, Fraser delivered a speech where he referred to his candidate in terms of an elaborate, graphic, and explicit sexual metaphor); *Morse v. Frederick,* 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (J. Alito, concurring opinion) (*Tinker*'s substantial-disruption test does not apply to students' off-campus expression). Off-campus speech, however, is more closely proscribed and the Supreme Court has never allowed schools to punish students for off-campus speech that is not school-sponsored or at a school-sponsored event and that caused no substantial disruption at school. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.,* 650 F.3d 915, 933 (3d Cir. 2011).

The Supreme Court has also drawn a distinction in how freedom of speech is treated on college campuses as compared with elementary and high schools; First Amendment protections should apply with less force on college campuses than in the community at large. *Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266, 108 S. Ct. 562, 567, 98 L. Ed. 2d 592 (1988) ("We have nonetheless recognized that the First Amendment rights of students in the public schools "are not automatically coextensive with the rights of adults in other settings"). Post-secondary institutions do not operate *in loco parentis*; they maintain "differing pedagogical goals" where students are adults with greater maturity, and many students reside on campus, subject to university rules at almost all times. *Doe v. Rector & Visitors of George Mason Univ.,* No. 1:15-CV-209, 2016 WL 775776, at *16 (E.D. Va. Feb. 25, 2016).

It then becomes critical to examine University policies regulating student speech, which

26

may be struck down as facially unconstitutional where they are overbroad and vague. *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177 (C.A.6 1995) (striking down university discriminatory harassment policy because it was overbroad, vague, and not a valid prohibition on fighting words); *UWM Post, Inc. v. Board of Regents of Univ. of Wis. System*, 774 F.Supp. 1163 (E.D.Wis.1991) (striking down university speech code that prohibited, *inter alia*, " 'discriminatory comments' " directed at an individual that " 'intentionally ... demean' " the " 'sex ... of the individual' " and " '[c]reate an intimidating, hostile or demeaning environment for education, university related work, or other university-authorized activity' "); *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (C.A.4 1993) (overturning on First Amendment grounds university's sanctions on a fraternity for conducting an "ugly woman contest" with "racist and sexist" overtones).

Employing a college-aged appropriate First Amendment analysis of Temple University's sexual harassment policy, the Third Circuit held that Temple's Policy was unconstitutional for prohibiting a substantial amount of non-vulgar, non-sponsored student speech, and applies to student speech that causes a hostile environment regardless of the student's motive or intent to do so. *DeJohn v. Temple Univ.*, 537 F.3d 301, 317-319 (3d Cir. 2008). A similar analysis was utilized in *Doe v. Rector & Visitors of George Mason Univ.*, which struck down the University's "true threats" policy as constitutionally overbroad in that it penalized a substantial amount of protected expressive activity, including the student's suicidal text message at issue.

Valencia's sexual harassment policy states, in relevant part:

Any unwelcome sexual advance, request for sexual favors, or other unwelcome verbal or physical conduct of a sexual nature, when:

Such conduct **has the purpose or effect of** unreasonably interfering with an individual's work or academic performance, i.e., it is sufficiently serious, pervasive, or persistent as to create an intimidating, hostile, humiliating, demeaning, or sexually offensive working, academic, or social environment

under both an objective (a reasonable person's) and subjective (the Reporting Party's) view.

(SAC ¶ 91.)

Like the unconstitutional sexual harassment policy in *DeJohn*, Valencia's sexual harassment policy prohibits speech that "has the purpose or effect of" causing a hostile environment. Valencia seeks to proscribe speech that intentionally *or inadvertently* causes a hostile environment, which poses the risk of prohibiting a substantial amount of non-vulgar, non-sponsored student speech. *DeJohn*, 537 F.3d 301, 319 (This ignores *Tinker*'s requirement that a school must reasonably believe that speech will cause actual, material disruption before prohibiting it"). Valencia's sexual harassment policy prohibits language that is "serious, pervasive, or persistent as to create an intimidating, hostile, humiliating, demeaning, or sexually offensive…environment," as determined by a similar type of subjective standard that was struck down in *Doe v. Rector & Visitors of George Mason Univ.* and *McCauley v. Univ. of the V.I.*, 52 V.I. 816, 849 (D.V.I. 2009). (SAC ¶ 91.)

The speech at issue here is comprised of a series of text messages between two adult students occurring within a 17-minute window of time. (SAC ¶ 59; Koeppel Decl. ¶¶ 9, 11.) Both students were located in their respective off-campus residences during the semester break following the end of the Summer 2014 semester; they were not located in a classroom or at a school-sponsored event. (SAC ¶¶ 28, 47-48; Koeppel Decl. ¶ 5.) The text messages at issue were provoked by a fight between Plaintiff and Jane Doe where it became apparent for the first time following a semester-long friendship as study partners that Jane Doe did not regard Plaintiff as a friend. (SAC ¶ 51; Koeppel Decl. ¶¶ 6-9.) Plaintiff did not text message any threats to Jane Doe, and he did not engage in any physical conduct with Jane Doe. (SAC ¶¶ 62-63; Koeppel Decl. ¶ 9.) Contrary to Jane Doe's claims, it was Jane Doe, not Plaintiff who initiated two phone calls

28

that night. (SAC ¶¶ 57, 169; Koeppel Decl. ¶ 18.) Based on the foregoing facts, Plaintiff had no reasonable basis to believe that his conduct would constitute violations of Valencia's sexual harassment policy. Unlike the constitutional criminal child pornography statute in *United States v. Williams*, 553 U.S. 285, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008), Valencia's sexual harassment policy contains indeterminate terms, "has the purpose or effect of," and includes a subjective standard in determining what language is "serious, pervasive, or persistent as to create an intimidating, hostile, humiliating, demeaning, or sexually offensive…environment." The risk of proscribing a substantial amount of protected expressive activity is present under Valencia's sexual harassment policy.

Finally, Valencia fails to even define "disorderly and lewd misconduct" under its policies, which imposes an even greater constitutional infringement on Plaintiff's First Amendment rights. There is no indication of what "disorderly" means or whether the term will be analyzed under a subjective or objective standard. *Doe v. Rector & Visitors of George Mason Univ.; McCauley.* The vagueness of such content-based terms raises a First Amendment concern because of its obvious chilling effect on Plaintiff's speech, in this case.

## IV. <u>ALTERNATIVELY, LEAVE TO AMEND IS WARRANTED</u>

Notwithstanding the foregoing, should the Court determine that Plaintiff's Title IX claim or any of the other claims were not adequately pleaded, Plaintiff hereby seeks leave to amend the Complaint. Fed. R. Civ. P. 15(a); *Foman v. Davis,* 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962); *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir. 2000) (*quoting Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.,* 911 F.2d 242, 247 (9th Cir. 1990). "court should give a plaintiff an opportunity to amend his complaint rather than dismiss it when it appears that a more carefully drafted complaint might state a claim upon which relief could be

granted." *Friedlander v. Nims*, 755 F.2d 810, 813 (11th Cir. 1985); citing Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.; also citing *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 597–99 (5th Cir.1981); also citing *Sarter v. Mays*, 491 F.2d 675, 676 (5th Cir.1974). Based on the foregoing, and given the great public interest in education decisions involving campus sexual assault such as the one at bar, the Court should exercise its discretion to grant Plaintiff leave to amend his Complaint.

## CONCLUSION

Hence, Defendants' motion to dismiss and for summary judgment should be denied, or in the alternative Plaintiff should be granted leave to amend its Second Amended Complaint.

GREENSPOON MARDER, P.A.
*Attorneys for Plaintiff, Jeffrey Koeppel*
Capital Plaza I, Suite 500
201 East Pine Street
Orlando, Florida 32801
Telephone:   (407) 425-6559
Facsimile:   (407) 563-9665
Email:       Edmund.loos@gmlaw.com

By: */s/ EDMUND O. LOOS III*
    EDMUND O. LOOS III
    Florida Bar No. 899161

WARSHAW BURSTEIN, LLP
*Lead Attorneys for Plaintiff, Jeffrey Koeppel*
555 Fifth Avenue
New York, NY 10017
T: (212) 984-7709
F: (212) 972-9150
Email: klau@wbcsk.com

By: */s/ Kimberly C. Lau*
    Kimberly C. Lau, Esq.
    *Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of April, 2016, I caused a true and correct copy of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss and for Summary Judgment to be served via U.S. Mail and email upon counsel of record Richard E. Mitchell, Esq., GrayRobinson, P.A., 301 East Pine St., Suite 1400, Post Office Box 3068 (32802-3068), Orlando, FL 32801 (Rick.Mitchell@gray-robinson.com), and Edmund O. Loos III, Esq., Greenspoon Marder, P.A., 201 East Pine Street, Suite 500, Orlando, FL 32801 (edmund.loos@gmlaw.com).

By: */s/ EDMUND O. LOOS III*
    EDMUND O. LOOS III
    Florida Bar No. 899161

26243625v1